**DAUGHERTY et al., Appellants and Cross–Appellees,**

**v.**

**WALLACE et al., Appellees and Cross–Appellants.**

[Cite as *Daugherty v. Wallace* (1993), 87 Ohio App.3d 228.]

Court of Appeals of Ohio,
Montgomery County.

No. 13619.

Decided April 16, 1993.

*Legal Aid Society of Cincinnati* and *R. Collins Owens III; Legal Aid Society of Dayton* and *Stanley A. Hirtle,* for individual appellants.

*Roger J. Makley* and *Janice M. Paulus,* for appellant Ohio Coalition for the Homeless, Inc.

*Lee Fisher,* Attorney General, *Alan P. Schwepe* and *Karen Lazorishak,* Assistant Attorneys General, for appellees and cross-appellants Terry A. Wallace et al.

*David J. Young,* for appellee Terry Wallace.

*Bert B. Lockwood, Jr.,* for *amicus curiae,* Urban Morgan Institute of Human Rights.

---

BROGAN, Judge.

Appellants, Scarlet Daugherty et al., appeal from the judgment of the Montgomery County Court of Common Pleas in favor of appellees, Terry A. Wallace et al.

The underlying facts and procedural history of the case are as follows. Appellants are citizens of Ohio who are recipients of General Assistance ("GA") health and cash benefits, and the Ohio Coalition for the Homeless, Inc. Appellees are the Director of the Ohio Department of Human Services, who administers the GA program, and the Ohio Attorney General. Appellants filed this case to challenge the constitutionality of the new statutory scheme.

In July 1991, the Ohio General Assembly adopted revisions to the state GA program which established two separate programs. Am.Sub.H.B. No. 298, effective July 26, 1991. Prior to the 1991 revisions, the GA program provided ongoing financial and medical assistance to all poor persons ineligible for federally funded assistance programs such as Aid to Families with Dependent Children ("AFDC") and Supplemental Security Income ("SSI"). The maximum combined GA cash benefit, comprised of a personal needs allowance and shelter allowance, was $148 per month for a single person. GA medical assistance covered basic physician, hospitalization, pharmacy and other miscellaneous services up to certain maximums. These benefits continued for as long as the person remained eligible. See former R.C. 5113.02(A) and (C).

The Ohio legislature revised the GA program effective October 1, 1991, R.C. 5103.03, and created a separate Disability Assistance ("DA") program. R.C. 5115.01. Under the revised GA program, the state provides destitute persons monthly cash assistance of $100 and medical coverage for no more than six months out of twelve. At the end of the six-month period, GA cash assistance

and primary care medical coverage stop regardless of the person's need, status or ability to find employment. Thus, even if such a person could demonstrate both total destitution and a good faith effort to find a job, he or she would not be entitled to more than six months' general assistance per year.

Under the new DA program, the state provides monthly cash assistance of $115 and basic medical coverage on a continuous, non-time-limited basis to persons ineligible for AFDC or SSI and who are unemployable due to age (under eighteen or over sixty years), or physical or mental disability, are medication dependent or are pregnant. See R.C. 5115.01; Ohio Adm.Code 5101:1–5–01; and Ohio Adm.Code 5101:1–5–02. The Ohio Department of Human Services has defined "disability" for DA purposes as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for not less than nine months." Ohio Adm.Code 5101:1–5–022(C).

The record makes clear that in the face of the drastic cuts in welfare benefits many of the named plaintiffs-appellants may have grim and uncertain futures. Most are completely or functionally illiterate. Some have medical and/or psychological problems which effectively prevent them from participating in society. All are living on the edge of a society in which housing and employment are often scarce commodities available only to those with the resources, education and ability to acquire them.

The plight of these appellants is disheartening and poignant. At least some of the former GA recipients will face life-threatening circumstances upon being cut off from general assistance benefits. Some will be forced into homelessness. Many will lose needed health benefits. We must assume, however, that the legislature and the Governor were aware of these potential consequences when the changes in the GA program were made.

On March 16, 1992, appellants filed their class action complaint seeking declaratory and injunctive relief challenging the revisions in the GA program under both the federal and state Constitutions. Appellants concurrently filed their motions for a preliminary injunction and class certification. On March 19, 1991, appellants filed an amended complaint.

On March 27, 1992, appellee, Terry A. Wallace, filed a motion to dismiss and a memorandum contra appellants' request for a preliminary injunction. On April 6, 1992, appellants sought leave to file a second amended complaint which was granted on April 22, 1992. The second amended complaint added Lee I. Fisher, Attorney General of the state of Ohio, as a named defendant. Appellees filed their motion to dismiss the second amended complaint, which incorporated the prior March 27, 1992 motion to dismiss and the reply filed on April 13, 1992.

The trial court heard oral arguments on the various pending motions on May 1, 1992. Numerous *amici curiae* on behalf of appellants sought and were granted leave to file briefs in the case. On August 11, 1992, the trial court granted appellees' motion to dismiss on the basis that appellants' had failed to state a claim upon which relief could be granted. Simultaneously, the trial court denied appellants motion for a preliminary injunction because the court determined that appellants could not demonstrate a likelihood of success on the merits. Appellants now appeal the lower court's decision dismissing the claims and denying the preliminary injunction.

Appellants assert the following two assignments of error: (1) the lower court erred to the prejudice of appellants by granting appellees' motion to dismiss because appellants have established two causes of action upon which to base their claims; and (2) the lower court erred to the prejudice of the appellants by denying their motion for a preliminary injunction because appellants have demonstrated a likelihood of success on the merits.

In their first assignment of error, appellants argue that the trial court erred in granting appellees' motion to dismiss because appellants have established two causes of action upon which to base their claim.

First, appellants contend that the changes in the GA statute violate Section 1, Article I of the Ohio Constitution. Appellants claim that the so-called "safety" provision of that clause guarantees the poor of Ohio the right of access to minimal public assistance payments. Second, appellants argue that the changes in the GA statute violate the Equal Protection and Benefit Clause of Section 2, Article I of the Ohio Constitution ("the Equal Protection Clause") because the classification utilized by the state to allocate GA/DA benefits denies recipients the equal benefits of the law.

Under a motion to dismiss for failure to state a claim upon which relief can be granted, the court must, as a matter of law, accept all of the allegations of the complaint as true. *Greely v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981 (construing Civ.R. 12[B][6] ). To grant such a motion, it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery. *Id.*

We will first address appellants' argument that the "safety" language of Section 1, Article I of the Ohio Constitution requires the legislature to provide minimal monthly subsistence payments to the poor of the state. Section 1, Article I reads as follows:

"All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty,

acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."

Appellants rely on the "safety" language of Section 1, Article I, which provides that all men have certain inalienable rights, among which is "obtaining * * * safety." Appellants argue that this language creates a fundamental right to "obtain safety." Appellants further argue that the alleged right to obtain safety guaranteed by the Ohio Constitution incorporates the right of destitute citizens to receive minimum assistance sufficient in amount and type to prevent homelessness and provide essential health care. Appellants contend that by adopting the revised GA/DA statute, the state has abandoned its constitutional obligation to ensure that its citizens are "safe" by providing subsistence welfare benefits. Thus, appellants argue, the statute is unconstitutional.

As has been noted by appellants and the various *amici*, this case presents an issue of first impression in the state of Ohio. This is apparently the first case in Ohio history in which the courts have been called upon to interpret that part of Section 1, Article I of the Ohio Constitution which refers to the inalienable right to seek and obtain "safety."

The trial court found that the safety provision does not place upon the state an affirmative duty to provide public assistance to its citizens. The trial court found the provision of public assistance by the state to be a discretionary legislative function and not a constitutional obligation stemming from the safety provision of the Ohio Constitution. Moreover, the trial court interpreted the safety clause in a manner consistent with the interpretations of the Fourteenth Amendment to the United States Constitution, that citizens are free to seek safety in their chosen manner, subject to reasonable state regulation and discretion, but that the state has no duty to furnish that safety. *Rust v. Sullivan* (1991), 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233.

■ We recognize that the outcome of this case will have a tremendous impact on those whose lives it touches. We have already noted that the plight of many former GA recipients is especially poignant. For the following reasons, however, we must agree with the trial court that the safety provision of Section 1, Article I of the Ohio Constitution does not create an affirmative duty or obligation on the part of the state of Ohio to provide subsistence welfare benefits to its citizens.

■ The first general principle which this court must adhere to in this, or any other, legal review of the constitutionality of a legislative enactment is the firmly established rule that legislative acts enjoy a strong presumption of constitutionality and that any doubts must be resolved in favor of the statute. *E.g., Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193, 199, 551 N.E.2d 938, 944.

Appellants' arguments are premised on the notion that the language of the safety provision creates and guarantees the fundamental right of "obtaining * * * safety." Appellants contend that the plain meaning of the constitutional term "safety" is unambiguous and clear: "[safety] encompasses the right to be free from the risks and dangers of living on the streets without housing and health care." Appellants contend that by virtue of this alleged fundamental right the state of Ohio has an affirmative obligation to provide its citizens with a minimal level of "safety" in the form of subsistence payments and access to health care. Appellants suggest that Ohio's one-hundred-ninety-year history of providing poor relief is an expression and recognition of the fundamental nature of the alleged right to receive assistance and evidence that the Ohio Bill of Rights incorporates and preserves the state's long-term practice of providing a welfare safety-net for the poor.

We are unpersuaded by appellants' arguments, and we decline to give such an expansive meaning to the "safety" language of the Ohio Constitution. We find nothing in the text of the Ohio Constitution which would support appellants' argument that the state of Ohio has a constitutional obligation to provide welfare payments to its needy citizens. Indeed, the very fact that the term "safety" is conjunctively associated with the term "happiness" leads us to the conclusion that the framers meant to give no other substance to the word than that of an aspirational statement of natural law rights upon which the state may not place unreasonable restrictions.

Concerning Section 1, Article I, it has been written:

"This section and succeeding § 2 are based on part of Article VIII, § 1, 1802 Ohio Constitution, which itself paraphrased the Declaration of Independence. It restates principles accepted before the Revolution: that man has certain inalienable rights under natural law; that the purpose of government is to secure and protect those rights; that all governmental powers depend on the people's consent. See, e.g., Resolutions of October 14, 1774, I Journals of the Continental Congress 63–73 (Worthington C. Ford ed, 1904); Blackstone's Commentaries 41–53 (J.W. Erlich ed, Nourse Publishing Co. 1959); Thomas Rutherford II, Institutes of Natural Law, Ch III (Cambridge, England, 1754–56)." Editorial Comment to Section 1, Ohio Constitution (Baldwin 1990).

In *Sowers v. Ohio Civ. Rights Comm.* (1969), 20 Ohio Misc. 115, 132, 49 O.O.2d 203, 212–213, 252 N.E.2d 463, 474–475, the court stated:

" 'Natural rights' are those rights which appertain originally and essentially to each person as a human being and are inherent in his nature, as contrasted to civil rights, which are given, defined and circumscribed by such positive laws, enacted by civilized communities, as are necessary to the maintenance of organized government * * *.

"* * * indiscriminate use of the term 'rights' to describe an immunity, or privilege, has fostered confusion in the law. Our constitutional government was originally framed on a system of limited powers, reserving rights in individuals. 'However,' * * *:

" '* * * what were reserved in this context were not actually rights but immunities—restraints on the government.' " (Citations omitted.)

In other words, an individual has an inalienable right to *seek* and obtain happiness and safety without undue state interference, but the Ohio Constitution clearly places no obligation upon the state to *provide* that happiness and safety.

Additionally, we cannot simply carve out the "safety" language of Section 1, Article I and animate it by giving it the status of a fundamental right as defined by appellants. If we were to hold that there is a fundamental right to safety which includes as an integral part an affirmative duty on the part of the state to provide minimal cash payments and access to health care benefits to its poor citizens, then we would logically be compelled to give equal constitutional significance and effect to the other conjunctive clauses of Section 1, Article I. Even appellants and their *amici* could not seriously argue that the state of Ohio has an affirmative obligation to *provide for* its citizens "enjoyment" of life, "acquisition" of property, or "obtainment" of happiness. Yet, undeniably, any other outcome would be disingenuous and result-oriented.

To conclude that the conjunctive clauses in Section 1, Article I create constitutional obligations would potentially thrust upon the back of state government the affirmative duty and responsibility for providing for practically every aspect of its citizens' lives. Were we to so interpret these clauses, we would be forced to recognize that the state is responsible for *providing* for each citizen minimal enjoyment of life, acquisition of minimal property, and obtainment of minimal happiness, as well as a minimal amount of safety. Obviously, such an interpretation of the constitutional language would be untenable. Merely trying to define this constitutional "obligation" or attempting to agree on what constitutes a "minimal" or "subsistence" level would lead to utter legislative chaos.

Instead, we agree with the trial court that the language of Section 1, Article I must be interpreted as a guarantee of rights. See *Meyers v. Defiance* (1940), 67 Ohio App. 159, 21 O.O. 165, 36 N.E.2d 162. The entire clause, when read as a whole, must be interpreted to place a restriction on the exercise of governmental powers and not to bestow affirmative obligations on the state. The state is restricted by the clause from wholly interfering with a citizen's inalienable right to pursue and enjoy life and liberty, to acquire and possess and protect his property, and to seek and obtain happiness and safety, but has no affirmative duty to provide for the exercise of these inalienable rights. Indeed, the state may, in certain circumstances, even burden these rights in accordance with the

law.  *Cincinnati v. Correll* (1941), 141 Ohio St. 535, 538, 26 O.O. 116, 117, 49 N.E.2d 412, 414.

While this may be the first time a court has been called upon to directly interpret the "safety" language of Section 1, Article I of the Ohio Constitution, courts which have had occasion to interpret its other conjunctive language have indicated that such language bestows no positive duties on the part of the state, but merely constitutes a limitation on governmental powers.  In *Palmer & Crawford v. Tingle* (1896), 55 Ohio St. 423, 45 N.E. 313, the Ohio Supreme Court stated:

"The inalienable right of enjoying liberty and acquiring property, guaranteed by the first section of the bill of rights of the [Ohio] constitution, embraces the right to be free in the enjoyment of our faculties, subject only to such restraints as are necessary for the common welfare."

In *Meyers v. Defiance, supra,* the court of appeals stated:

"The right to seek and obtain happiness and safety is one of the inalienable rights of mankind, so declared by the Constitution, and guaranteed by that instrument.  The 'pursuit of happiness' has been interpreted as the right to follow or pursue any occupation or profession without restriction and without having any burden imposed upon one that is not imposed upon others in a similar situation. [Citations omitted.]  Adopting this definition of 'pursuit of happiness,' Section 1, Article 1 of the Constitution of Ohio * * * is the legal equivalent of the * * * fourteenth amendment to the Constitution of the United States * * * as a restriction on the exercise of governmental powers."  *Id.,* 67 Ohio App. at 168, 21 O.O. at 169, 36 N.E.2d at 166–167.

The Ohio Supreme Court has also held that, when read in conjunction, Sections 1, 2, 16, and 19, Article I, are the equivalent of the Fourteenth Amendment's Due Process Clause.  *State ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, 8, 15 O.O.3d 3, 4, 399 N.E.2d 66, 67, citing *Direct Plumbing Supply Co. v. Dayton* (1941), 138 Ohio St. 540, 21 O.O. 422, 38 N.E.2d 70; *Akron v. Chapman* (1953), 160 Ohio St. 382, 52 O.O. 242, 116 N.E.2d 697.  Accordingly, the Ohio Supreme Court has determined that decisions of the United States Supreme Court can be utilized to give "true meaning" to the Bill of Rights of the Ohio Constitution. *Direct Plumbing Supply Co., supra.*

■ We find persuasive the United States Supreme Court's interpretation of the federal Constitution's Due Process Clause and apply it to Section 1, Article I of the Ohio Constitution: "The clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cty. Soc. Serv. Dept.* (1988), 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249, 258–259.  Moreover, the Due Process Clause general-

ly confers no right to government aid, even if such aid is needed to secure an individual's interest in life, liberty or property of which the government is forbidden to actively deprive an individual. *Webster v. Reproductive Health Serv.* (1989), 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410.

Indeed, the duty to act affirmatively on behalf of an individual is triggered only when the state takes an individual into custody or otherwise restrains his liberty in such a manner that it renders him unable to care for himself. *Estelle v. Gamble* (1976), 429 U.S. 97, 103–104, 97 S.Ct. 285, 290–291, 50 L.Ed.2d 251, 259–260. Thus, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitations which it has imposed on his freedom to act on his behalf." *DeShaney, supra,* 489 U.S. at 199–200, 109 S.Ct. at 1005–1006, 103 L.Ed.2d at 262. It is the state's affirmative act of restraining an individual's ability to act on his own behalf which triggers the protection of the Due Process Clause, "not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.* at 200, 109 S.Ct. at 1006, 103 L.Ed.2d at 262.

The fact that the state of Ohio has provided some type of relief to the poor for almost two centuries does not compel us to conclude that a constitutional right to such relief has been thereby recognized or conferred. Nowhere have appellants pointed to, nor have we discovered, any positive statement by the legislature that its actions in providing relief for the poor have ever been motivated by, or premised upon, a constitutional duty flowing from the "safety" provision. In the absence of both unambiguous textual support in the Constitution or any extrinsic evidence to bolster appellants' position, we cannot conclude that the legislature's mere act of providing relief to the poor constitutes, by itself, a recognition and validation of the existence of a constitutional obligation to provide such relief. As the United States Supreme Court has noted, "the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *DeShaney,* 489 U.S. at 201, 109 S.Ct. at 1006, 103 L.Ed.2d at 263.

Appellants further argue that support for their position can be found in the constitutions of other states which have afforded welfare entitlements the status of constitutional rights. See *Butte Community Union v. Lewis* (1986), 219 Mont. 426, 712 P.2d 1309; *Butte Community Union v. Lewis* (1987), 229 Mont. 212, 745 P.2d 1128. For example, Section 3(3), Article XII, of the 1972 Montana Constitution provides:

"The legislature shall provide such economic assistance and social and rehabilitative services as may be necessary for inhabitants who, by reason of age, infirmities, or misfortune may have the need for the aid of society."

This language, however, is a far cry from that present in the Ohio Constitution. The Montana Constitution clearly and unambiguously requires the state legisla-

ture to provide assistance to the needy even if their need is the result of misfortune. Unfortunately, the Ohio Constitution contains no remotely similar language from which we can draw the conclusion that the receipt of minimal welfare benefits is a significant or fundamental constitutional right.

Finally, we cannot ignore the fact that the United States Supreme Court has explicitly held that the denial of welfare benefits implicates no fundamental right. *Dandridge v. Williams* (1970), 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491. Instead, the court has considered such programs as general economic and social welfare measures which are to be reviewed under the basic rationality standard of the due process and equal protection guarantees. See Rotunda & Nowak, Treatise on Constitutional Law, Substance and Procedure (2 Ed.1992) 292, Section 18.25. As the United States Court of Appeals for the Third Circuit noted in *Price v. Cohen* (C.A.3, 1983), 715 F.2d 87, 93:

"Plaintiffs maintain that because they are destitute and unable to find work, the right at issue in this case is the right to subsist. The right to basic subsistence is arguably the most fundamental of all human rights. For a person who is starving and without shelter, all other rights appear to pale in comparison. As employed by the Supreme Court, however, the term fundamental right does not mean rights of particular human or societal significance. *San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 33, 93 S.Ct. 1278, 1298, 36 L.Ed.2d 16 (1973). Rather it means those rights which have their source, explicitly or implicitly, in the Constitution. *Plyler v. Doe*, 457 U.S. [202] at 217 n. 15, 102 S.Ct. [2382] at 2395 n. 15 [72 L.Ed.2d 786, 799 n. 15 (1982)].

"Nowhere does the Constitution explicitly guarantee the right to receive welfare. Were this a matter of first impression, we might conclude that subsistence is impliedly protected by the Constitution, because it is of basic human importance and fundamental to the meaningful exercise of all other rights. This is not, however, a matter of first impression. The Supreme Court has considered the issue on numerous occasions and consistently rejected any attempt to require the state to justify its economic and social policies by showing some compelling state interest, *San Antonio School District v. Rodriguez*, 411 U.S. at 33, 93 S.Ct. at 1296 [36 L.Ed.2d at 42], even when 'the most basic economic needs of impoverished human beings are at stake.' *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970)."

In sum, we cannot conclude that the "safety" language of Section 1, Article I of the Ohio Constitution creates a fundamental or constitutionally significant right to receive minimal welfare benefits from the state of Ohio. We find no support for such a proposition in the text or history of the Ohio Constitution, in Ohio or federal case law, or in the available extrinsic sources. Moreover, we are not convinced that merely because the legislature has seen fit to provide an important

and possibly life-preserving benefit to its citizens over a long period of time that the receipt of such benefit necessarily becomes a fundamental right to "safety." Finally, we conclude that the state has an affirmative duty to provide for an individual's "safety" only when the state has so restrained that individual's liberty that he is unable to seek and obtain safety for himself. Such is not the case here.

Accordingly, we are compelled to agree with the trial court that there is no fundamental right to receive welfare benefits in Ohio and that the state is not obligated by Section 1, Article I to provide a minimal amount of "safety" to its citizens.

In the second issue of their first assignment of error, appellants argue that the trial court erred in granting appellees' motion to dismiss because the GA statute violates the Equal Protection and Benefit Clause of the Ohio Constitution.

Appellants take great pains to point out that they bring their equal protection claim exclusively under the Ohio Constitution and not under the United States Constitution. We note, however, that the Ohio Supreme Court has held, "[t]he limitations placed upon governmental action by the Equal Protection Clauses of the Ohio and United States Constitutions are essentially identical." *Kinney v. Kaiser Aluminum & Chem. Corp.* (1975), 41 Ohio St.2d 120, 123, 70 O.O.2d 206, 207–208, 322 N.E.2d 880, 882. See, also, *Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193, 203, 551 N.E.2d 938, 947. In recognition of this substantial similarity, the Ohio Supreme Court has consistently relied on federal precedent to give substance to its equal protection analysis under the Ohio Constitution. See, *e.g.*, *id.* at 204–205, 551 N.E.2d at 948–949.

In *Beatty v. Akron City Hosp.* (1981), 67 Ohio St.2d 483, 492, 21 O.O.3d 302, 307–308, 424 N.E.2d 586, 591, the Ohio Supreme Court articulated its well-established equal protection analysis:

"Simply stated, the test is that unequal treatment of classes of persons by a state is valid only if the state can show that a rational basis exists for the inequality, unless the discrimination impairs the exercise of a fundamental right or establishes a suspect classification. * * * If the discrimination infringes upon a fundamental right, it becomes the subject of strict judicial scrutiny and will be upheld only upon a showing that it is justified by a compelling state interest. That is, once the existence of a fundamental right or a suspect class is shown to be involved, the state must assume the heavy burden of proving that the legislation is constitutional. * * *"

We have already determined that there is no fundamental right to a minimal level of "safety" in the form of cash payments and access to health care provided by the state and therefore strict scrutiny is inapplicable to this case. Appellants have not argued that the statute implicates a suspect classification.

Appellants argue, in the alternative, that this court should analyze the statute using an intermediate-level scrutiny. We have found only two circumstances in which such intermediate-level scrutiny has been explicitly applied, to wit, statutory classifications involving the so-called "quasi-suspect" classes of gender and illegitimacy. *E.g., Craig v. Boren* (1976), 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (gender); *New Jersey Welfare Rights Org. v. Cahill* (1973), 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (illegitimacy). These sensitive classifications must be substantially related to the achievement of some important governmental interest. *E.g., Lalli v. Lalli* (1978), 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503. However, appellants do not contend that the GA/DA statute classifies on the basis of gender or illegitimacy and therefore this species of middle-tier scrutiny is inapplicable to the present case.

Appellants also argue for a heightened level of scrutiny on the basis of the Montana cases which carved out a middle-tier scrutiny to review legislation which affected welfare benefits. See *Butte Community Union, supra.* We again note that Section 3(3), Article XII of the Montana Constitution specifically requires the Montana legislature to provide assistance to those persons who are needy "by reason of * * * misfortune" as well as the aged and infirm. By virtue of this specific language, the Montana Supreme Court held that the right to receive minimum welfare benefits was a "constitutionally significant" right. As such, a higher level of scrutiny than mere rationality review was deemed necessary.

We do not have such explicit language present in the Ohio Constitution and thus we have determined that, in Ohio, the receipt of welfare benefits is neither a fundamental nor a constitutionally significant right. Montana's blueprint for protecting its citizens' right to receive subsistence welfare benefits is not transposable upon the law of Ohio, but is unique to constitutional language indigenous to Montana. Therefore, we do not find the Montana cases applicable to our analysis of the constitutionality of the GA/DA statute and we decline to follow them.

Appellants' next argument for a higher level of scrutiny is based upon several cases in which they claim that the Ohio Supreme Court has in fact applied heightened scrutiny while purporting to utilize the rational basis test.

The first three cases on which appellants rely are from the workers' compensation arena. *State ex rel. Doersam v. Indus. Comm.* (1988), 40 Ohio St.3d 201, 533 N.E.2d 321; *State ex rel. Nyitray v. Indus. Comm.* (1983), 2 Ohio St.3d 173, 2 OBR 715, 443 N.E.2d 962; *Kinney v. Kaiser Aluminum & Chem. Corp., supra.*

In *Nyitray*, the Ohio Supreme Court held that a statute denying accrued but unpaid workers' compensation to dependents of workers who died from work-related causes, while compensating those workers who died from a cause other

than a compensable injury or occupational disease, violated both the federal and state Equal Protection Clauses. In so holding, the court reasoned as follows:

"Ohio's workers' compensation system is predicated upon Section 35, Article II of the Ohio Constitution, which states that the purpose of workers' compensation is to compensate 'workmen and *their dependents,* for death, injuries or occupational disease, occasioned in the course of such workmen's employment * * *.' (Emphasis added.) Clearly, the purpose of R.C. 4123.60 is to fulfill this objective of compensating dependents. However, the statutory classification which exists in R.C. 4123.60 as interpreted by *Spiker* [*v. Indus. Comm.* (1943), 141 Ohio St. 174, 25 O.O. 271, 47 N.E.2d 217] precludes the class represented by appellant, dependents of workers who died from work-related causes, from obtaining the compensation accrued and due, or for which application had not been made * * *. We view this classification which denies dependents of workers who died from work-related causes from obtaining compensation due, while paying the dependents of workers who died from other causes, as inherently unfair and *contrary to the purpose of compensating dependents stated in the Constitution.*" (Emphasis added.) 2 Ohio St.3d at 175–176, 2 OBR at 717, 443 N.E.2d at 964.

In *Kinney,* the Ohio Supreme Court struck down as violative of both federal and state equal protection certain jurisdictional limitations on claims for workers' compensation by the survivors of victims of industrial accidents. In so holding, the court stated:

"Ohio's system of workers' compensation is predicated upon Section 35, Article II of the Ohio Constitution. That constitutional provision states that one objective of such a system is to compensate dependents of workmen 'for death * * * occasioned in the course of such workmen's employment.' Clearly, the major purpose of R.C. 4123.59 is to fulfill this objective. However, the jurisdictional prerequisites contained in that statute classify dependents of deceased workmen into two groups, those who can meet one or more of the prerequisites and those who cannot, and automatically preclude the consideration of a claim for death benefits filed by a member of the latter group. If given an opportunity to present evidence, it is certain that some members of the excluded group could prove a causal connection between an industrial injury and the subsequent death of the workmen. (Footnote omitted.) *Therefore, one effect of the classifications established by the jurisdictional prerequisites of R.C. 4123.59 is, in some cases, to obstruct the fulfillment of one objective of Section 35, Article II and the major objective of R.C. 4123.59.*" (Emphasis added.) 41 Ohio St.2d at 123–124, 70 O.O.2d at 208, 322 N.E.2d at 883.

Finally, in *Doersam,* the Ohio Supreme Court struck down a statutory classification which boosted the ceiling on death benefits to one hundred percent of the statewide average weekly wage for deceased workers' wholly dependent claim-

ants where a worker was injured after 1976. The court found that differentiating between claimants whose decedents were injured after 1976 or who were drawing total disability benefits, and claimants whose decedents were partially disabled or who were injured prior to 1976, violated equal protection. In so holding, the court again made reference to the underlying constitutional foundation of the workers' compensation system contained at Section 35, Article II.

In each of the foregoing decisions, the Ohio Supreme Court explicitly stated that it was applying the rational basis test to determine the constitutionality of the classification at issue. Moreover, the court looked to the purpose of the statutory scheme in order to determine the rationality of the applicable statute. See *Nyitray, supra,* 2 Ohio St.3d at 175, 2 OBR at 717, 443 N.E.2d at 964.

In all three cases the court articulated its "rational basis" test as follows: the statutory classification could be upheld only if it were shown that it was rationally related to the accomplishment of "some state objective at least as important as the objective of compensating dependents of workmen whose deaths are occasioned in the course of serving their employers." *Kinney,* 41 Ohio St.2d at 124, 70 O.O.2d at 208, 322 N.E.2d at 883.

In each case the outcome was dependent, therefore, upon the rationality of the relationship between the statutory classification and the goal of the legislature, but in each case such a determination was made with reference to the importance of the underlying constitutionally mandated objective of compensating workers who were injured or killed in the course of their employment. Section 35, Article II, Ohio Constitution.

Accordingly, in all three cases, the court found that the state objectives of cost savings or administrative convenience, while legitimate governmental concerns, were not goals which were at least as important as the underlying constitutional mandate to compensate all eligible workers under the workers' compensation system. Furthermore, the court found that the statutory classification at issue obstructed one or more of the objectives of the constitutionally mandated workers' compensation system.

Thus, we agree with appellants that the statutory classifications at issue in *Kinney, Nyitray* and *Doersam* were reviewed with somewhat more intensity by the Ohio Supreme Court than is typical for a rational basis analysis. We conclude, however, that such an analysis does not generalize into the present GA/DA controversy.

As we have stated, the Ohio Constitution contains no language which we believe would fairly support the conclusion that Ohio citizens have a constitutional right to receive subsistence welfare payments from the state. Moreover, there is no clear language in the Ohio Constitution which would support the conclusion

that the receipt of such benefits is in any way constitutionally cognizable. Therefore, the analysis utilized by the Ohio Supreme Court in *Kinney, Nyitray* and *Doersam,* in which the court employed the rational basis test with reference to the importance of the underlying constitutional objectives of workers' compensation, is clearly inapplicable.

Stated somewhat differently, because we find no implied or express authority for the proposition that the poor have a fundamental or constitutionally significant right to receive welfare payments from the state, we have no explicit constitutional objective to balance against the objectives of the legislature in passing the GA/DA statute, and thus necessarily cannot employ the more searching brand of rational review employed by the Ohio Supreme Court in *Kinney, Nyitray* and *Doersam.*

Finally, appellants point to *Primes v. Tyler* (1975), 43 Ohio St.2d 195, 72 O.O.2d 112, 331 N.E.2d 723, in support of their argument for subjecting the GA/DA statute to a higher level of scrutiny than "mere rationality" review.

In *Primes,* the Ohio Supreme Court held the Ohio guest statute unconstitutional. Appellants correctly describe the court's equal protection test in that case as " 'whether there is an appropriate governmental interest suitably furthered by the differential treatment.' " *Id.* at 199, 72 O.O.2d at 114, 331 N.E.2d at 726, quoting *Police Dept. of Chicago v. Mosley* (1972), 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 216.

We certainly agree that in this case the Ohio Supreme Court applied a different type of scrutiny to the classifications of the Ohio guest statute than the "mere rationality" test. In *Primes,* the court held that the guest statute did not "suitably further" the articulated governmental interests in preventing collusive lawsuits or fostering the "amorphic" concept of hospitality. *Primes, supra,* 43 Ohio St.2d at 202, 72 O.O.2d at 115, 331 N.E.2d at 728. Moreover, the court concluded that the statute created an irrebuttable presumption that a lawsuit filed by a nonpaying guest is fraudulent or collusive. *Id.* at 202–203, 72 O.O.2d at 116, 331 N.E.2d at 728.

We are unpersuaded, however, that the "suitable basis" test used in *Primes* is the test that either the Ohio or United States Supreme Court would currently use to analyze under equal protection principles the constitutionality of a statute which does not implicate a fundamental right, a suspect classification, or a quasi-suspect classification. See, *e.g., Califano v. Aznavorian* (1978), 439 U.S. 170, 99 S.Ct. 471, 58 L.Ed.2d 435; *Morris v. Savoy* (1991), 61 Ohio St.3d 684, 576 N.E.2d 765.

We believe that the proper formulation of the equal protection, rational basis test to apply in order to determine the constitutionality of the GA/DA statute was

set forth recently in *Morris v. Savoy,* at 689, 576 N.E.2d at 770.  In *Morris,* the Ohio Supreme Court held that, in a case which does not involve a fundamental right or a suspect class, the disputed statute "must be upheld if there exists any conceivable set of facts under which the classification rationally furthered a legitimate legislative objective."  *Id.*

█  We conclude that the objectives articulated by the state in this case are clearly legitimate.  The state of Ohio has explained that in creating the distinction between GA and DA recipients, it was attempting to balance the state budget while allocating scarce resources to those most in need.  This is unarguably a legitimate state objective.  See, *e.g., Lyng v. Internatl. Union Auto. Workers, UAW* (1988), 485 U.S. 360, 373, 108 S.Ct. 1184, 1193, 99 L.Ed.2d 380, 393.

Our inquiry is limited, therefore, to the question of whether the Ohio General Assembly rationally could have believed that the division of general assistance recipients into two categories, GA recipients and DA recipients, would help to balance the state budget while reallocating scarce resources to those most in need.

█  Both the Ohio Supreme Court and United States Supreme Court have set forth a highly deferential brand of rational review.  "A classification having some reasonable basis does not offend against [the equal protection] clause merely because it is not made with mathematical nicety or because in practice it results in some inequality."  *Lindsley v. Natural Carbonic Gas Co.* (1911), 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369, 377.  Indeed, in the area of economics and social welfare, even "illogical" and "unscientific" approximations by the legislature may suffice.  *Dandridge v. Williams, supra,* 397 U.S. at 485, 90 S.Ct. at 1161, 25 L.Ed.2d at 502.

As the United States Supreme Court has stated, "[w]here * * * there are plausible reasons for the [legislature's] action, our inquiry is at an end.  It is, of course, constitutionally irrelevant whether this reasoning in fact underlay the legislation, because this Court has never insisted that a legislative body articulate its reasons for enacting a statute."  *U.S. RR. Retirement Bd. v. Fritz* (1980), 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368, 378.  In addition, the requirements of equal protection " 'do not prohibit classification for legislative purposes, provided that there is a rational and natural basis therefor, that is based on a substantial difference between those to whom it does and those to whom it does not apply * * *.' "  *Morris v. Savoy, supra,* 61 Ohio St.3d at 691, 576 N.E.2d at 771, quoting *Richardson v. Carnegie Library Restaurant, Inc.* (1988), 107 N.M. 688, 694, 763 P.2d 1153, 1159.

In *Goldberg v. Kelly* (1970), 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287, the United States Supreme Court held that states could not terminate an individual's

welfare benefits prior to a quasijudicial administrative hearing on the recipient's eligibility. The court held that the interest of the eligible recipient in the uninterrupted receipt of public assistance, which provides him with essential food, clothing, housing, and medical care, coupled with the state's interest that his payments not be erroneously terminated, clearly outweighs the state's competing concerns to prevent any increase in its fiscal and administrative burden.

Justice Brennan wrote the following in *Goldberg* at 264–265, 90 S.Ct. at 1019, 25 L.Ed.2d at 297, of the court's opinion:

"Moreover, important governmental interests are promoted by affording recipients a pre-termination evidentiary hearing. From its founding the Nation's basic commitment has been to foster the dignity and well-being of all persons within its borders. We have come to recognize that forces not within the control of the poor contribute to their poverty. This perception, against the background of our traditions, has significantly influenced the development of the contemporary public assistance system. Welfare, by meeting the basic demands of subsistence, can help bring within the reach of the poor the same opportunities that are available to others to participate meaningfully in the life of the community. At the same time, welfare guards against the societal malaise that may flow from a widespread sense of unjustified frustration and insecurity. Public assistance, then, is not mere charity, but a means to 'promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity.' The same governmental interests that counsel the provision of welfare, counsel as well its uninterrupted provision to those eligible to receive it; pre-termination evidentiary hearings are indispensable to that end." (Footnote omitted.)

A few months later, the United States Supreme Court in *Dandridge v. Williams, supra,* held that a Maryland regulation which imposed a ceiling of $250 per month on an AFDC grant regardless of the size of the family and its actual need did not violate the Equal Protection Clause of the federal Constitution. The court held that the regulation was rationally supportable and free from invidious discrimination since it furthers the state's legitimate interest in encouraging employment and in maintaining an equitable balance between welfare families and the families of the working poor.

Justice Stewart, at 397 U.S. at 485–487, 90 S.Ct. at 1162–1163, 25 L.Ed.2d at 502–503, wrote in defense of requiring only the most relaxed judicial scrutiny of welfare legislation:

"To be sure, the cases cited, and many others enunciating this fundamental standard under the Equal Protection Clause, have in the main involved state regulation of business or industry. The administration of public welfare assistance, by contrast, involves the most basic economic needs of impoverished human beings. We recognize the dramatically real factual difference between the

cited cases and this one, but we can find no basis for applying a different constitutional standard. See *Snell v. Wyman*, 281 F.Supp. 853, aff'd, 393 U.S. 323 [89 S.Ct. 553, 21 L.Ed.2d 511]. It is a standard that has consistently been applied to state legislation restricting the availability of employment opportunities. *Goesaert v. Cleary*, 335 U.S. 464 [69 S.Ct. 198, 93 L.Ed. 163]; *Kotch v. Board of River Port Pilot Comm'rs*, 330 U.S. 552 [67 S.Ct. 910, 91 L.Ed. 1093]. See also *Flemming v. Nestor*, 363 U.S. 603 [80 S.Ct. 1367, 4 L.Ed.2d 1435]. And it is a standard that is true to the principle that the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy.

"Under this long-established meaning of the Equal Protection Clause, it is clear that the Maryland maximum grant regulation is constitutionally valid. We need not explore all the reasons that the State advances in justification of the regulation. It is enough that a solid foundation for the regulation can be found in the State's legitimate interest in encouraging employment and in avoiding discrimination between welfare families and the families of the working poor. By combining a limit on the recipient's grant with permission to retain money earned, without reduction in the amount of the grant, Maryland provides an incentive to seek gainful employment. And by keying the maximum family AFDC grants to the minimum wage a steadily employed head of a household receives, the State maintains some semblance of an equitable balance between families on welfare and those supported by an employed breadwinner.

"It is true that in some AFDC families there may be no person who is employable. It is also true that with respect to AFDC families whose determined standard of need is below the regulatory maximum, and who therefore receive grants equal to the determined standard, the employment incentive is absent. But the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61 [31 S.Ct. 337, 55 L.Ed. 369]. It is enough that the State's action be rationally based and free from invidious discrimination. The regulation before us meets that test.

"We do not decide today that the Maryland regulation is wise, that it best fulfills the relevant social and economic objectives that Maryland might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration, *Goldberg v. Kelly, ante* [397 U.S.], p. 254 [90 S.Ct. p. 1011, 25 L.Ed.2d p. 287].

But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients. Cf. *Steward Mach. Co. v. Davis,* 301 U.S. 548, 584–585 [57 S.Ct. 883, 889–890, 81 L.Ed. 1279, 1289–1290]; *Helvering v. Davis,* 301 U.S. 619, 644 [57 S.Ct. 904, 910, 81 L.Ed. 1307, 1316–1317]." (Footnotes omitted.)

Justice Marshall dissented and expressed his concern that the court had emasculated the Equal Protection Clause as a constitutional principle applicable to the area of social welfare legislation. Marshall wrote at 397 U.S. at 520–522, 90 S.Ct. at 1179–1180, 25 L.Ed.2d at 522–523:

"This case simply defies easy characterization in terms of one or the other of these 'tests.' The cases relied on by the Court, in which a 'mere rationality' test was actually used, *e.g., Williamson v. Lee Optical Co.,* 348 U.S. 483 [75 S.Ct. 461, 99 L.Ed. 563] (1955), are most accurately described as involving the application of equal protection reasoning to the regulation of business interests. The extremes to which the Court has gone in dreaming up rational bases for state regulation in that area may in many instances be ascribed to a healthy revulsion from the Court's earlier excesses in using the Constitution to protect interests that have more than enough power to protect themselves in the legislative halls. This case, involving the literally vital interests of a powerless minority—poor families without breadwinners—is far removed from the area of business regulation, as the Court concedes. Why then is the standard used in those cases imposed here? We are told no more than that this case falls in 'the area of economics and social welfare,' with the implication that from there the answer is obvious.

"In my view, equal protection analysis of this case is not appreciably advanced by the *a priori* definition of a 'right,' fundamental or otherwise. Rather, concentration must be placed upon the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the asserted state interests in support of the classification. As we said only recently, 'In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.' *Kramer v. Union School District,* 395 U.S. 621, 626 [89 S.Ct. 1886, 1889, 23 L.Ed.2d 583, 589] (1969), quoting *Williams v. Rhodes,* 393 U.S. 23, 30 [89 S.Ct. 5, 10, 21 L.Ed.2d 24, 31] (1968).

"It is the individual interests here at stake that, as the Court concedes, most clearly distinguish this case from the 'business regulation' equal protection cases. AFDC support to needy dependent children provides the stuff that sustains those children's lives: food, clothing, shelter. And this Court has already recognized

several times that when a benefit, even a 'gratuitous' benefit, is necessary to sustain life, stricter constitutional standards, both procedural and substantive, are applied to the deprivation of that benefit." (Footnotes omitted.)

In *Jefferson v. Hackney* (1972), 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285, the court found not invidious and violative of the Equal Protection Clause the Texas scheme allotting a lower percentage of calculated need to AFDC families than to recipients of aid to the blind, disabled and elderly, since the state may have concluded that the aged and infirm are the least able of the categorical grant recipients to bear the hardships of an inadequate standard of living.

Marshall again, in dissent, noted that the record was replete with evidence that AFDC was politically unpopular, and that its recipients were in fact stigmatized and looked down on by the community. *Id.* at 575, 92 S.Ct. at 1745, 32 L.Ed.2d at 312. Furthermore, Texas made no effort to show that AFDC recipients actually were better able to improve their situation or endure hardship, a proposition that appears quite susceptible of proof. Tribe, American Constitutional Law (2 Ed.) 1988, 1664, fn. 13; Nowak, Realigning the Standards of Review Under the Equal Protection Guarantee—Prohibited, Neutral, and Permissive Classifications (1974), 62 Geo.L.J. 1071, 1119.

In *Sweiker v. Wilson* (1981), 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186, the court upheld the denial of supplemental subsistence benefits ("SSI") to needy aged, blind, disabled persons in public institutions even though they were otherwise eligible for such benefits but for their institutionalization. The court held that the classification was to be judged under the rational basis standard which does not allow the court to substitute its personal notions of good public policy for those of Congress. The court held that under that standard it was not irrational for Congress to elect, in view of budgetary constraints, to shoulder only part of the burden of supplying a "comfort money" allowance, leaving the states with the primary responsibility for making such an allowance available to those residents in state-run institutions, and to decide that it is the Medicaid recipients in public institutions who are the most needy and deserving of SSI benefits.

We further note that while we may disagree with the actions of the General Assembly in cutting off entirely the benefits of obviously needy individuals, "[h]ere, as in the area of due process, this court 'may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations * * *; in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment. * * *'" (Emphasis deleted.) *Sedar v. Knowlton Constr. Co., supra,* 49 Ohio St.3d at 204–205, 551 N.E.2d at 949, quoting *New Orleans v. Dukes* (1976), 427 U.S. 297, 303–304, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511, 517.

It is well known that the General Assembly and the Governor instituted the cuts in welfare benefits as a cost-saving measure ostensibly in response to a combination of rising expenditures and lowered revenues, and in the face of the constitutional mandate to balance the state budget. Governor Voinovich tearfully announced to the citizens of Ohio that the GA cuts were absolutely necessary in order to balance the state budget and that benefits would be apportioned to those most in need.

The benefits were apportioned between those who qualify for unlimited DA assistance, *i.e.*, those who are ineligible for AFDC or SSI, and are unemployable due to age (under eighteen or over sixty years) or a qualifying mental or physical disability, are pregnant, or are medication dependent, and all others, *i.e.*, those who only qualify for limited GA benefits. The regulations define disability for the purposes of DA as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for not less than nine months." Ohio Adm. Code 5101:1–5–022(C).

It is uncontroverted that the DA class may not include many people who are perhaps equally as unemployable as those within the class. Appellants argue that the potential employability of many persons who qualify for limited GA benefits is equally as poor as those who qualify for unlimited DA benefits. Additionally, appellants contend that many of the legislative assumptions underlying the classification are faulty. For example, appellants argue that the assumption that those cut off from unlimited benefits can quickly find self-sustaining employment is not supported by the reality of the state's economy, which appellants say cannot absorb such a large number of unskilled workers.

As we stated above, our review in this case is severely limited. "We may not compel the state 'to verify its logical assumptions with statistical evidence.' *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812, 96 S.Ct. 2488, 2499, 49 L.Ed.2d 220 (1976), nor may we reject common sense propositions relied on by the state because they are overbroad or underinclusive. *Vance v. Bradley*, 440 U.S. [93] at 111–112, 99 S.Ct. [939] at 949–50 [59 L.Ed.2d 171, 184–185]." *Price v. Cohen, supra*, 715 F.2d at 95,

As the Ohio Supreme Court stated in *Sedar v. Knowlton Constr. Co., supra*, 49 Ohio St.3d at 204–205, 551 N.E.2d at 948–949:

"[E]qual protection does not require perfection when making classifications. *Massachusetts Bd. of Retirement v. Murgia* (1976), 427 U.S. 307, 314 [96 S.Ct. 2562, 2567, 49 L.Ed.2d 520, 525]. ' "[W]hen legislative authority is exerted within a proper area, it need not embrace every conceivable problem within that field. The Legislature may proceed one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. * * *" ' *Jewel*

*Cos., Inc. v. Burlington* (1974), 365 Mass. 274, 279, 311 N.E.2d 539, 542, quoting *Mobil Oil Corp. v. Atty. Gen.* (1972), 361 Mass. 401, 417, 280 N.E.2d 406, 417. The General Assembly is not required, under the rubric of equal protection, to choose between dealing with all aspects of a problem or not dealing with it at all. *Dandridge v. Williams* (1970), 397 U.S. 471, 486–487 [90 S.Ct. 1153, 1162, 25 L.Ed.2d 491, 503]. Where, as here, the classifications made by the General Assembly are rational and not arbitrary, the requirements of equal protection are satisfied."

We cannot say that the General Assembly's decision to allocate benefits between those who medically qualify or those who qualify due to age or other infirmity and those who do not was irrational. The General Assembly could rationally have believed that age, pregnancy and a medically determinable physical or mental disability constituted a relevant difference in the general assistance population and that by distinguishing between these individuals and individuals without the qualifying characteristics it was furthering legitimate state objectives. Indeed, in *Jefferson v. Hackney, supra,* 406 U.S. at 549, 92 S.Ct. at 1733, 32 L.Ed.2d at 297–298, the United States Supreme Court stated:

"Since budgetary constraints do not allow the payment of the full standard of need for all welfare recipients, the State may have concluded that the aged and infirm are the least able of the categorical grant recipients to bear the hardships of an inadequate standard of living. While different policy judgments are of course possible, it is not irrational for the state to believe that the young are more adaptable than the sick and elderly, especially because the latter have less hope of improving their situation in the years remaining to them. Whether or not one agrees with this state determination, there is nothing in the Constitution that forbids it."

Thus, with some reluctance and regret, we must bow to the dictates of the extremely deferential approach we are required to take in this case and hold that the classifications at issue pass constitutional muster. While we seriously doubt the wisdom or compassion of the welfare cuts, "[o]ur doubt * * * does not permit us to deviate from that approach and to demand that the legislature enact a more considered or carefully tailored general assistance program." *Price v. Cohen, supra,* 715 F.2d at 96.

Accordingly, we find that the trial court did not err in granting appellees' motion to dismiss for failure to state a claim upon which relief could be granted, and thus appellants' first assignment of error is overruled.

■ In their second assignment of error, appellants contend that the trial court erred by denying their motion for a preliminary injunction. We agree with the trial court that appellants failed to show a strong or substantial likelihood of

success on the merits of their claim. Accordingly, we overrule appellants' second assignment of error.

In light of the foregoing, the judgment of the Montgomery County Court of Common Pleas will be affirmed.

Appellees have filed a cross-appeal in this case but do not challenge or wish to alter the judgment of the trial court. Since we have affirmed the judgment of the trial court the assignments of error raised by appellees' cross-appeal are overruled on the grounds that they are moot.

*Judgment affirmed.*

WOLFF, J., concurs.

FAIN, J., concurs separately.

FAIN, Judge, concurring.

Although I concur fully in the well-reasoned opinion of the court, I write separately merely to elaborate upon my reasons for rejecting the appellants' argument that the distinction made by the General Assembly between General Assistance and Disability Assistance has no rational basis.

As I understand the scheme, Disability Assistance is made available year-round to those who are physically unable to work. General Assistance is made available six months out of every twelve to those persons who cannot find work despite good faith efforts to do so.

In my view, it is not necessarily irrational for the General Assembly to have concluded, in the face of insufficient revenues to meet all perceived public needs of the state, that those persons who are physically capable of working should be given the maximum possible incentive to find work, so that more resources will be available to meet other perceived needs. Dropping a destitute person off the welfare rolls for six months out of every twelve, while arguably cruel, heartless, and unwise,[1] provides a stronger incentive to that person to find gainful work than does the requirement of certifying good-faith efforts to find work.

Our task is not to determine whether the legislation under review is wise, or even consonant with what we consider to be the norms of a civilized society, but merely to determine whether it has a rational basis. In my view, the legislation before us meets that minimal test.

---

1. Would not the same maximum pressure imposed upon the destitute to find gainful employment also serve as a powerful temptation towards illegal, corrupt activity, such as drug trafficking, burglary and prostitution?