CITY OF EAST CLEVELAND, APPELLEE, *v.* SCALES, APPELLANT.

(No. 44556—Decided April 25, 1983.)

*Mr. Leonard Young,* for appellee.

*Mr. James D. London* and *Cleveland Legal Aid Society,* for appellant.

DAY, P.J. On June 17, 1981, a complaint was brought in the East Cleveland Municipal Court charging that "on or about the 9th day of April AD 1981 * * * Rosetta C. Scales did unlawfully and knowingly possess or control or have on or about her person a handgun without a handgun owner's identification card issued to her and not being exempt or upon a suitable firing range, to wit: a .38 caliber Arminius Titan Tiger * * *," in

violation of East Cleveland Municipal Ordinances Section 545.14(a).[1]

Defendant-appellant Scales ("defendant") filed a motion to dismiss, claiming that the ordinance was unconstitutional. Following oral argument, the court ruled against her, upholding the ordinance. The defendant was found guilty by the court, fined, and given a three-day suspended sentence. The gun was ordered confiscated and destroyed.

The defendant appeals assigning one error:

"The ordinances of the city of East Cleveland which require the registration of handguns, the possession of an identification card, and the penalties thereunder, violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United State's [sic] Constitution."

For the reasons adduced below, the judgment is affirmed.

I

The defendant's single assignment of error presents a thicket of issues, including questions involving the Second and Fourteenth Amendments to the United States Constitution and Section 4, Article I of the Ohio Constitution. Untangling them, the first question is whether the ordinance was passed pursuant to legitimate authority.

Section 3, Article XVIII of the Ohio Constitution provides that:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

There is little doubt that the gun control ordinance is a police regulation passed in the exercise of local self-government. A decisive question is whether the ordinance is "in conflict with general laws," particularly R.C. 2923.13.[2]

The law in Ohio on "conflict" is stringent. Pre-emption is not easily demonstrated. The classic test was given in *Village of Struthers* v. *Sokol* (1923), 108 Ohio St. 263, at 268:

"* * * No real conflict can exist unless the ordinance declares something to be right which the state law declares to be wrong, or vice versa. There can be no conflict unless one authority grants a permit or license to do an act which is forbidden or prohibited by the other."

---

[1] "545.14 REQUIRED REGISTRATION OF HANDGUNS; IDENTIFICATION CARD; FEE; APPEALS.

"(a) No person shall purchase, own, possess, receive, have on or about his person, or use any handgun except upon a suitable firing range, unless such person has a handgun owner's identification card issued to him and in effect pursuant to this section, or unless such person is exempt from the requirements of an identification card pursuant to Section 545.15. (Ord. 6105. Passed 3-10-70.)"

[2] R.C. 2923.13, having weapons while under disability.

"(A) Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

"(1) Such person is a fugitive from justice;

"(2) Such person is under indictment for or has been convicted of any felony of violence, or has been adjudged a juvenile delinquent for commission of any such felony;

"(3) Such person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse, or has been adjudged a juvenile delinquent for commission of any such offense;

"(4) Such person is drug dependent or in danger of drug dependence, or is a chronic alcoholic;

"(5) Such person is under adjudication of mental incompetence.

"(B) Whoever violates this section is guilty of having weapons while under disability, a felony of the fourth degree."

This rule has been followed in numerous cases.

An example of strict or actual conflict was found in a unique situation where the same crime was treated on the one hand as a felony by the state and on the other as a misdemeanor by the municipality. The court found conflict because the municipality was able to defeat state policy "by deliberately changing an act which constitutes a felony under state law into a misdemeanor * * *." *Cleveland* v. *Betts* (1958), 168 Ohio St. 386, 389 [7 O.O.2d 151].[3]

In the present case, however, R.C. 2923.13 punishes conduct significantly different than that punished by the East Cleveland ordinance. The local law makes criminal the failure of an otherwise qualified person to obtain the proper registration and identification. The state law prohibits the possession of firearms by described categories of persons.

Applying the *Sokol* test, there is no actual conflict. R.C. 2923.13(A) states a negative: certain classes of people shall not "knowingly acquire, have, carry or use any firearm or dangerous ordnance." The statute does *not* say that those people *not* in the excluded classes have a *right* to carry weapons. The imposition of a further requirement that a possessor of firearms follow registration procedures does not conflict with the state strictures. The question remains — is there any federal constitutional impediment to the ordinal regulation?

## II

Under the rubric of the Due Process Clause, the defendant claims what is variously called a "civil right" or "fundamental right" to bear arms; and further, that the ordinance unreasonably interferes with this right. Two possible sources for the claimed right are suggested: the federal Constitution and the common law. Only the first is of concern here except as the common law illumines the historical context of the Second Amendment. For while the common law does not announce transcendental doctrine, the Second Amendment does.

If, under the common law, there was a right to bear arms available to individuals, regulation of the right has existed since at least 1328. The Statute of Northampton, 1 English Statutes at Large 420, 422, 2 Edw. III, Chapter 3 (1328), provided that:

"[N]o man great nor small [shall] * * * go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure."

Later, in 1670, the very keeping of a gun was barred to those of insufficient property:

"III. And it is hereby enacted and declared, That all and every person and persons not having lands and tenements, or some other estate of inheritance, in his own or his wife's right, of the clear yearly value of one hundred pounds *per annum*, or for term of life, or having lease or leases of ninety-nine years, or for any longer term, of the clear yearly value of one hundred and fifty pounds, other than the son and heir apparent of an esquire, or other person of higher degree, and the owners and keepers of forests, parks, chases or warrens, being stocked with deer or conies for their necessary use, in respect of the said forests, parks, chases or warrens, are hereby declared to be persons by the laws of this realm not allowed to have or keep for themselves, or any other person or persons, any guns, bows, greyhounds, settingdogs, ferrets, coneydogs, lurchers, hays, nets, lowbels, harepipes, gins, snares, or other engines aforesaid; but shall be and are hereby prohibited to have, keep or use the same." 8

---

[3] *Betts* involved a municipal ordinance "very similar in context" to then existent R.C. 2923.01, *id.* at 387.

English Statutes at Large 380, 381, 22 Car. II, Chapter 25, Section 3.

The defendant suggests that the Second Amendment to the federal Constitution protects the claimed right.[4]

The Second Amendment provides:

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

The crucial question in interpreting the amendment is the relation between the first two clauses and the second two.

In *United States* v. *Miller* (1939), 307 U.S. 174, the court adhered to what may be called the "militia" or "collectivist" interpretation and held that, absent proof to the contrary, an eighteen-inch barrel shotgun was not ordinary military equipment reasonably related "to the preservation or efficiency of a well regulated militia," *id.* at 178. Thus, the Second Amendment was no impediment to a statute barring the unregistered possession of the weapon.

The court put the amendment into perspective:

"The Constitution as originally adopted granted to the Congress power — 'To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, *reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.'* [Clauses 15, 16, Section 8, Article I.] With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the *Second Amendment were made. It must be interpreted and applied with that end in view.*" (Emphasis added.) *Id.*

Thus, the clauses of the amendment are bound together. The right of an individual is dependent upon a role in rendering the militia effective. It is a military, not an individual, concept.[5]

Moreover, it is clear from its history that the Second Amendment figured importantly in the equation balancing power between the federal and state governments. By guaranteeing the right of the states to arm their militias composed of citizen-soldiers, the amendment could forestall reliance upon a professional, federal standing army, which was seen as a threat to liberty.[6]

The amendment responds to the fears discussed by Madison in The Federalist, No. 46:

"* * * Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devo-

---

[4] In her brief, the defendant relies on the Fourth Amendment, an apparent mistake.

[5] See text and cases in connection with fn. 6, *infra.*

[6] See Feller & Gotting, The Second Amendment: A Second Look (1966), 61 N.W.U. L. Rev. 46, especially 52-62 and 64-66; Weatherup, Standing Armies and Armed Citizens: An Historical Analysis of the Second Amendment (1975), 2 Hast. Const. L. Q. 961, 994-1000; Notes (1976), 26 Drake L. Rev. 423. See, also, Ohio Constitution, Section 4, Article I: "Standing armies, in time of peace, are dangerous to liberty, and shall not be kept up.

* * *" This follows a specific reference that "The *people* have the right to bear arms for *their* defense and security" (emphasis supplied). The safeguard is a collective, not an individual, one; for a comparable view of the Second Amendment, see *United States* v. *Adams* (S.D. Fla. 1935), 11 F. Supp. 216, 219; and, see, *United States* v. *Tot* (C.A. 3, 1942), 131 F. 2d 261, 266-267, reversed (1943), 319 U.S. 463, on grounds unrelated to Second Amendment considerations. There are contrary views — see, *p.e.,* Levine & Saxe, The Second Amendment: The Right to Bear Arms (1969), 7 Houston L. Rev. 1.

tion of the federal government; still it would not be going too far to say that the State governments, with the people on their side, would be able to repel the danger. The highest number to which, according to the best computation, a standing army can be carried in any country, does not exceed one hundredth part of the whole number of souls; or one twenty-fifth part of the number able to bear arms. This proportion would not yield, in the United States, an army of more than twenty-five or thirty thousand men. To these would be opposed a militia amounting to near half a million of citizens with arms in their hands, officered by men chosen from among themselves, fighting for their common liberties, and united and conducted by governments possessing their affections and confidence. It may well be doubted, whether a militia thus circumstanced could ever be conquered by such a proportion of regular troops." Hamilton, Jay, Madison, The Federalist (Bicentenial Ed. 1976) 310.

By protecting the existence of the state militias, the Second Amendment was intended to help preserve the political and military balance between the state and federal government. The amendment is a limitation on the federal power, not a grant of individual right. *Mosher* v. *Dayton* (1976), 48 Ohio St. 2d 243, 248 [2 O.O.3d 412].[7]

Moreover, the Second Amendment does not apply to state action. For it has never been incorporated or absorbed into the Due Process Clause of the Fourteenth Amendment. Therefore, it governs only federal action. *Presser* v. *Illinois* (1886), 116 U.S. 252, 265; *United States* v. *Cruikshank* (1875), 92 U.S. 542, 553.

Having failed to establish that the East Cleveland ordinance denies any fundamental or civil right to carry weapons, due process "demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." *Nebbia* v. *New York* (1934), 291 U.S. 502, 525; *Cincinnati* v. *Correll* (1943), 141 Ohio St. 535, 539 [26 O.O. 116]. This minimum standard has been met. For:

"This court can conceive of no matter more concerned with public safety, health and welfare of the citizens * * * than that of the indiscriminate purchase and use of firearms, and the regulation thereof in any manner, not preempted by the state of Ohio * * *."[8]

Registration of both the individual owner and the handgun involved are reasonable means of attaining that goal. *Mosher* v. *Dayton, supra,* at 247; *University Heights* v. *O'Leary* (1981), 68 Ohio St. 2d 130, 135 [22 O.O.3d 372].

### II B

The defendant's equal protection claim can be similarly disposed. The legislative classification will be upheld if it is rational, absent the denial of a fundamental right. *Williamson* v. *Lee Optical* (1955), 348 U.S. 483, 488-489.

Section 545.14(a) of the ordinance requires all possessors of handguns within the city limits to have an owner identification card. Excepted are those "upon a suitable firing range" and those listed in Section 545.15. These include, among others, state and federal officers, manufacturers and dealers in handguns, nonresidents authorized by the sheriff of their place of residence to carry handguns, and non-residents who enter the city for purposes of exhibiting or trading handguns.

Assuming, without deciding, that the defendant had standing to challenge these classifications, the requirement that all unexcepted possessors obtain proper registration is a rational regulation.

---

[7] See the discussion in *English* v. *State,* (1872), 35 Tex. 473, 476-481.

[8] *Photos* v. *Toledo* (1969), 19 Ohio Misc. 147, 162 [48 O.O.2d 274].

30

## III

Under the aegis of due process the defendant raises the issue of her ignorance of her duty to register. She relies on *Lambert* v. *California* (1957), 355 U.S. 225, where the court struck down a Los Angeles ordinance which made an offense of the failure of convicted felons to register with the chief of police upon being present in the city for more than five days or more than five occasions within a thirty-day period.

This issue was decided in *University Heights* v. *O'Leary, supra,* at 134-135:

"The *Lambert* decision rested on three factors: (1) The conduct involved was passive, (2) the situation addressed by the ordinance would not move one to inquire as to the applicable law, and (3) the law is designed solely for its convenience in compiling a list which might be of some assistance to law enforcement agencies. *United States* v. *Weiler* (C.A. 3, 1972), 458 F. 2d 474, 478. None of these factors is present in the instant cause.

"First, mere passive conduct is not involved here. To violate the law, one must acquire possession of a firearm. *United States* v. *Crow* (C.A. 9, 1971), 439 F. 2d 1193, 1196, vacated on other grounds, 404 U.S. 1009 (1972); *State* v. *Drummonds* (1975), 43 Ohio App. 2d 187, 188-189 [72 O.O.2d 406]. Second, the regulated conduct here, possession of a firearm, is one which by its nature suggests the possibility of governmental regulation. *United States* v. *Freed* [(1971), 401 U.S. 601], *supra*; *United States* v. *Weiler* [(C.A. 3, 1972), 458 F. 2d 474], *supra.* Third, the gun registration ordinance involved here is not designed solely for the convenience of law enforcement agencies. The purpose of the ordinance is to protect the citizens * * * from violence arising from handguns and other firearms by keeping firearms out of the hands of unfit persons, that is, those ineligible to receive a Restricted Weapons Owner's Identification Card. See *Mosher* v. *Dayton* (1976), 48 Ohio St. 2d 243 [2 O.O.3d 412]; *State* v.

*Drummonds, supra*; *Photos* v. *Toledo* (1969), 19 Ohio Misc. 147 [48 O.O.2d 274]."

The East Cleveland ordinance is not unconstitutional under *Lambert.*

## IV

The final constitutional claim made by the defendant is that the ordinance unreasonably restricts her fundamental right to travel.

First, the right protected by the Due Process Clause is simply the right to travel, *Shapiro* v. *Thompson* (1969), 394 U.S. 618, 629-633, 634, 638, 641-642, not the right to travel armed.

Second, the defendant is a resident of East Cleveland, and as such has no standing to challenge the ordinal effects on non-residents. For that challenge would implicate an "imaginary" case while the present decision, of necessity, deals only with the case in hand, cf., *Yazoo & Miss. Valley R.R. Co.* v. *Jackson Vinegar Co.* (1912), 226 U.S. 217, 219-220.

## V

The judgment is affirmed.

*Judgment affirmed.*

CORRIGAN and NAHRA, JJ., concur.