ARNOLD ET AL., APPELLANTS, *v.* CITY OF CLEVELAND, APPELLEE.

[Cite as *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35.]

(No. 92–105—Submitted April 7, 1993—Decided August 11, 1993.)

---

*Porter, Wright, Morris & Arthur, Richard M. Markus, Daniel F. Gourash* and *David C. Tryon,* for appellants.

*Danny R. Williams,* Director of Law, *Kathleen A. Martin,* Chief Assistant Director of Law, and *Michael A. Dolan,* Assistant Director of Law, for appellee.

*Scott R. Mote,* urging reversal for *amici curiae,* League of Ohio Sportsmen, Law Enforcement Alliance of America, American Federation of Police, Ohio Gun Collectors Association, Jews for the Preservation of the Second Amendment, Heartland Institute, Ohio Women, and Ohio Rifle and Pistol Association.

*Keating, Muething & Klekamp* and *Richard L. Creighton, Jr.*, urging reversal for *amicus curiae*, Congress of Racial Equality, Inc.

*Stefan B. Tahmassebi; Porter, Wright, Morris & Arthur, Richard M. Markus, Daniel F. Gourash, David C. Tryon* and *K. Bradley Mellor*, urging reversal for *amicus curiae*, National Rifle Association of America.

*Warhola, O'Toole, Loughman, Alderman & Stumphauzer* and *Sally Drews Brodbeck*, urging reversal for amicus curiae, Ohio Constitution Defense Council.

*Dan L. Ferguson*, urging reversal for *amici curiae*, Larry G. Beaver et al.

*Jones, Day, Reavis & Pogue, Erwin N. Griswold* and *Edwin L. Fountain*, urging affirmance for *amici curiae*, Fraternal Order of Police of Ohio, Inc., Fraternal Order of Police Cleveland Lodge, Ohio Association of Chiefs of Police and Center to Prevent Handgun Violence Legal Action Project.

*Dennis A. Henigan* and *Judith Bonderman*, urging affirmance for *amicus curiae*, Center to Prevent Handgun Violence Legal Action Project.

*Ulmer & Berne, Michael N. Ungar, Marsha I. Paley* and *Kimberly Brown Schroeder*, urging affirmance for *amici curiae*, Handgun Control Federation of Ohio, Inc. and Ohio Chapter of the American Academy of Pediatrics.

*Lee I. Fisher*, Attorney General, *Theresa Rittinger Schaefer, Andrew S. Bergman* and *Robert A. Zimmerman*, Assistant Attorneys General, urging affirmance for *amicus curiae*, Ohio Attorney General.

---

DOUGLAS, J. The underlying issue in this appeal concerns the constitutionality of an ordinance which bans the possession and sale of "assault weapons" in the city of Cleveland. Appellants challenge this legislation on essentially two grounds. First, appellants contend that the ordinance is an overbroad restriction on their constitutional right to bear arms and defend themselves and, thus, is in violation of Sections 1 and 4, Article I of the Ohio Constitution. Second, appellants maintain that the ordinance violates the Supremacy Clause of the federal Constitution.

I

A

Presumption of Constitutionality

In determining the constitutionality of an ordinance, we are mindful of the fundamental principle requiring courts to presume the constitutionality of lawfully enacted legislation. *Univ. Hts. v. O'Leary* (1981), 68 Ohio St.2d 130, 135, 22 O.O.3d 372, 375, 429 N.E.2d 148, 152; and *Hilton v. Toledo* (1980), 62 Ohio St.2d 394, 396, 16 O.O.3d 430, 431, 405 N.E.2d 1047, 1049. Further, the legislation

being challenged will not be invalidated unless the challenger establishes that it is unconstitutional beyond a reasonable doubt. *Id.* See, also, *Hale v. Columbus* (1990), 63 Ohio App.3d 368, 372, 578 N.E.2d 881, 883.

## B

### State and Federal Constitutions

Section 4, Article I of the Ohio Constitution provides that:

"The people have the right to bear arms for their defense and security; but standing armies, in time of peace, are dangerous to liberty, and shall not be kept up; and the military shall be in strict subordination to the civil power."

Appellants maintain that the ordinance violates Section 4, Article I of the Ohio Constitution.[4] Specifically, appellants urge that the ordinance acts to deny them the fundamental "individual" right to bear arms and defend themselves. Appellants' argument places at issue the scope of Section 4, Article I, which has not been previously considered by this court.

The question as to whether individuals have a fundamental right to bear arms has, seemingly, been decided in the negative under the Second Amendment to the United States Constitution.[5] See, generally, *United States v. Cruikshank* (1876), 92 U.S. 542, 553, 23 L.Ed. 588, 591–592; *Presser v. Illinois* (1886), 116 U.S. 252, 264–265, 6 S.Ct. 580, 584, 29 L.Ed. 615, 618–619; and *United States v. Miller* (1939), 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206. See, also, *Quilici v. Village of Morton Grove* (C.A.7, 1982), 695 F.2d 261, 269, certiorari denied (1983), 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170; *Rabbitt v. Leonard* (1979), 36 Conn.Supp. 108, 110, 413 A.2d 489, 490; *Commonwealth v. Davis* (1976), 369 Mass. 886, 890, 343 N.E.2d 847, 850; and *E. Cleveland v. Scales* (1983), 10 Ohio App.3d 25, 28–29, 10 OBR 32, 35–36, 460 N.E.2d 1126, 1130–1131.

In *Presser, supra,* the United States Supreme Court considered a claim that an Illinois statute, which forbade men to associate together as military organizations or to drill or parade with arms in public without authorization, violated the Second Amendment. Relying on *Cruikshank, supra,* the court rejected that claim and reasoned that:

---

4. Appellants also contend that the ordinance violates Section 1, Article I of the Ohio Constitution. This section provides that:

"All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."

5. The Second Amendment to the United States Constitution provides that:

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

"We think it clear that the sections under consideration * * * do not infringe the right of the people to keep and bear arms. But a conclusive answer to the contention that this amendment prohibits the legislation in question lies in the fact that the amendment is a limitation only upon the power of Congress and the National government, and not upon that of the States. It was so held by this court in the case of *United States v. Cruikshank*, 92 U.S. 542, 553 [23 L.Ed. 588, 591–592], * * * that the right of the people to keep and bear arms 'is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The Second Amendment declares that it shall not be infringed, but this, as has been seen, means no more than it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the National government, leaving the people to look for their protection against any violation by their fellow-citizens of the rights it recognizes to what is called in *The City of New York v. Miln*, 11 Pet. [102] 139 [9 L.Ed. 648], *"the powers which relate to merely municipal legislation, or what was perhaps more properly called internal police," "not surrendered or restrained" by the Constitution of the United States.'"* (Emphasis added.) *Presser, supra,* 116 U.S. at 264–265, 6 S.Ct. at 584, 29 L.Ed. at 618–619.

Subsequently, in *Miller, supra,* the court considered the scope of the Second Amendment. *Miller* involved a federal Act which prohibited the transportation in interstate commerce of unregistered shotguns having barrels less than eighteen inches in length. The court disagreed with the defendants' argument that the federal restriction violated the Second Amendment. The court determined that the defendants failed to prove at trial that an eighteen-inch barrel shotgun had any "reasonable relationship to the preservation or efficiency of a well regulated militia * * *." *Id.,* 307 U.S. at 178, 59 S.Ct. at 818, 83 L.Ed. at 1209.

The court, in reaching that determination, put the Second Amendment into perspective and observed that:

"The Constitution as originally adopted granted to the Congress power—'To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.' With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. *It must be interpreted and applied with that end in view."* (Emphasis added.) *Id.,* 307 U.S. at 178, 59 S.Ct. at 818, 83 L.Ed. at 1209.

The vast majority of decisions which have considered the Second Amendment convey that this amendment is applicable to the federal government. These decisions signify, and history supports the position, that the amendment was drafted not with the primary purpose of guaranteeing the rights of individuals to keep and bear arms but, rather, to allow Americans to possess arms to ensure the preservation of a militia.[6] This view has been stated by some courts and legal scholars to be a "collective" right as opposed to an "individual" concept.[7]

We note that the Second Amendment has not yet been held to be applicable to the states. The amendment has not been absorbed either directly or through selective incorporation in the Fourteenth Amendment. See *Malloy v. Hogan* (1964), 378 U.S. 1, 4, 84 S.Ct. 1489, 1491, 12 L.Ed.2d 653, 656–657, fn. 2. See, also, *State v. Kessler* (1980), 289 Ore. 359, 362, 614 P.2d 94, 95, fn. 4; *Kellogg v. Gary* (Ind.1990), 562 N.E.2d 685, 692; and Ashman, Handgun Control by Local Government (1982), 10 N.Ky.L.Rev. 97, 100–101.

## C

### State Constitutionalism/New Federalism

The United States Supreme Court has repeatedly reminded state courts that they are free to construe their state constitutions as providing different or even broader individual liberties than those provided under the federal Constitution. See, *e.g., City of Mesquite v. Aladdin's Castle, Inc.* (1982), 455 U.S. 283, 293, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152, 162 (" * * * [A] state court is entirely free to read its own State's constitution more broadly than this Court reads the Federal Constitution, or to reject the mode of analysis used by this Court in favor of a different analysis of its corresponding constitutional guarantee."); and *California v. Greenwood* (1988), 486 U.S. 35, 43, 108 S.Ct. 1625, 1630, 100 L.Ed.2d 30, 39 ("Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution."). See, also, *Pruneyard Shopping Ctr. v. Robins* (1980), 447 U.S. 74, 81, 100 S.Ct.

---

6. There has been an abundance of articles written by legal scholars, historians and students on the history of the Second Amendment. A common understanding among these writers on the subject is that the Second Amendment was drafted at a time when standing armies were not strongly favored and generally regarded as a threat to a free government.

7. There seem to be two separate views, on the "collective" versus "individual" concept, among state courts which have interpreted *their* constitutional provisions regarding the right to bear arms. Some courts have found that the safeguard is a collective right. These courts have taken a stance advocating more restrictive gun control legislation. Other courts have emphasized that the right to bear arms extends to individuals. These courts disdain overly restrictive gun control legislation. See, generally, Annotation, Validity of State Gun Control Legislation Under State Constitutional Provisions Securing the Right to Bear Arms (1991), 86 A.L.R. 4th 931, 943–946.

2035, 2040, 64 L.Ed.2d 741, 752. Further, in *Michigan v. Long* (1983), 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476–3477, 77 L.Ed.2d 1201, 1214–1215, the Supreme Court reinforced its comments in this area by declaring that the state courts' interpretations of state constitutions are to be accepted as final, as long as the state court plainly states that its decision is based on independent and adequate state grounds.

A noticeable trend has recently emerged among state courts.[8] It appears that more state courts are increasingly relying on their constitutions when examining personal rights and liberties. See *Davenport v. Garcia* (Tex.1992), 834 S.W.2d 4, 12, fn. 21. See, also, *State v. Johnson* (1975), 68 N.J. 349, 353, 346 A.2d 66, 67. A common thread found in the state court decisions which have relied exclusively on the state's constitution is that states may not deny individuals or groups the minimum level of protections mandated by the federal Constitution. However, there is no prohibition against granting individuals or groups greater or broader protections.

The recent movement by state courts to rely on their constitutions, rather than on the federal Constitution, has been labeled "state constitutionalism" or "new federalism." This movement has met with considerable approval. *Davenport, supra*, 834 S.W.2d at 12, fn. 22. See, also, Brennan, State Constitutions and the Protection of Individual Rights (1977), 90 Harv.L.Rev. 489, and Comment, Interpretation and Authority in State Constitutionalism (1993), 106 Harv.L.Rev. 1147. One court has pointedly stated that "[w]hen a state court interprets the constitution of its state merely as a restatement of the Federal Constitution, it both insults the dignity of the state charter and denies citizens the fullest protection of their rights." *Davenport, supra*, 834 S.W.2d at 12.

In joining the growing trend in other states, we believe that the Ohio Constitution is a document of independent force. In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall. As long as state courts provide at least as much protection as the United States Supreme Court has provided in its interpretation of the federal Bill of Rights, state courts are unrestricted in according greater civil liberties and protections to individuals and groups.

---

8. It appears that the Ohio Supreme Court has been reluctant to use the Ohio Constitution to extend greater protection to the rights and civil liberties of Ohio citizens. When presented with opportunities to do so, this court has not, on most occasions, used the Ohio Constitution as an independent source of constitutional rights. See Porter & Tarr, The New Judicial Federalism and the Ohio Supreme Court: Anatomy of a Failure (1984), 45 Ohio St.L.J. 143.

## D

### Right to Bear Arms in Ohio

We are cognizant of the current controversy that exists in Ohio and across our nation over the right of an individual to possess firearms. If debated today as a new issue, such a provision in a state constitution like ours might be completely different. However, it is our charge to determine and not to disturb the clear protections provided by the drafters of our Constitution.

The language of Section 4, Article I of the Ohio Constitution is clear. This provision is divided by two semicolons, coordinating three independent clauses. Rather than focusing merely on the preservation of a militia, as provided by the Second Amendment, the people of Ohio chose to go even further. Section 4, Article I not only suggests a preference for a militia over a standing army, and the deterrence of governmental oppression, it adds a third protection and secures to every person a fundamental *individual* right to bear arms for "their *defense and security* * * *." (Emphasis added.) This clause was obviously implemented to allow a person to possess certain firearms for defense of self and property. Accord *State v. Hogan* (1900), 63 Ohio St. 202, 218–219, 58 N.E. 572, 575.

The original Ohio Constitution was adopted in 1802. The Constitution was revised in 1851 and the 1802 version of the right-to-bear-arms clause was changed.[9] There is no reported debate over the right-to-bear-arms language as used in either the 1802 or 1851 versions. We can only surmise that no debate ensued over these provisions because the right to possess and use certain arms under certain circumstances was widely recognized and uncontroversial.

The right to defend oneself has always been permitted in this nation. Further, this privilege has been recognized in both a civil and criminal context since about 1400 in England. Prosser & Keeton, The Law of Torts (5 Ed.1984) 124, Section 19. "The privilege extends to the use of all *reasonable* force to *prevent* any threatened harmful or offensive bodily contact, or any confinement * * *." (Emphasis added.) *Id.* at 124. This privilege also includes the right, under appropriate circumstances, to defend one's family and property.[10]

The right of defense of self, property and family is a fundamental part of our concept of ordered liberty. To deprive our citizens of the right to possess any firearm would thwart the right that was so thoughtfully granted by our forefathers and the drafters of our Constitution. For many, the mere possession of a

---

9. Section 20, Article VIII of the 1802 Ohio Constitution provided:

"That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in time of peace, are dangerous to liberty, they shall not be kept up; and that the military shall be kept under strict subordination to the civil power."

10. See, also, Prosser & Keeton, The Law of Torts (5 Ed.1984) 129–131, Sections 20 and 21.

firearm in the home offers a source of security. Furthermore, given the history of our nation and this state, the right of a person to possess certain firearms has indeed been a symbol of freedom.

Sir William Blackstone, an often-cited and well-recognized commentator in the area of personal rights, recognized the fundamental concept to have and use arms for self-preservation and defense. Pronouncing this concept a personal liberty, he said:

"And we have seen that these rights consist, primarily, in the free enjoyment of personal security, of personal liberty, and of private property. So long as these remain inviolate, the subject is perfectly free; for every species of compulsive tyranny and oppression must act in opposition to one or other of these rights, having no other object upon which it can possibly be employed. To preserve these from violation, it is necessary that the constitution * * * be supported in its full vigor * * *. And all these rights and liberties it is our birthright to enjoy entire; unless where the laws of our country have laid them under necessary restraints. Restraints in themselves so gentle and moderate, as will appear upon farther inquiry, that no man of sense or probity would wish to see them slackened. * * *" 1 Blackstone's Commentaries, Of the Absolute Right of Individuals (1765) 144.

Fundamental rights (personal liberties) are those rights which are explicitly or implicitly embraced by our Constitution and the federal Constitution.[11] Our goal should be to preserve the existence of these sacred rights. However, to achieve this objective, the people of our nation, and this state, cannot have unfettered discretion to do as we please at all times. Neither the federal Bill of Rights nor this state's Bill of Rights, implicitly or explicitly, guarantees unlimited rights.

For instance, the protections of assembly, speech and press found in the First Amendment and Sections 3 and 11, Article I of the Ohio Constitution, while fundamental in our free society, cannot, in order to preserve these rights, be unlimited. For good reason, one does not have the right to yell "fire" in a crowded theater, nor are persons with opinions or beliefs always entitled to express them on an unlimited basis to a group in any public place at any time. *Planned Parenthood Assn. of Cincinnati, Inc. v. Project Jericho* (1990), 52 Ohio St.3d 56, 59, 556 N.E.2d 157, 161. Likewise, the freedom granted to the press is not unlimited. Defamation laws limit, albeit slightly, the absoluteness of the right. A clear limit is also found in Section 11, Article I of the Ohio Constitution which states, in part, that "[e]very citizen may freely * * * publish his sentiments

11. Black's Law Dictionary (6 Ed.1990) 674, defines "fundamental right" as "[t]hose rights which have their source, and are explicitly or implicitly guaranteed, in the federal Constitution * * * and state constitutions * * *[.]"

on all subjects, *being responsible for the abuse of the right * * *.*" (Emphasis added.)

Pursuant to the Fourth Amendment and Section 14, Article I of the Ohio Constitution, "the people [are] to be secure in their persons, [and] houses, * * * against unreasonable searches and seizures * * *." As a general rule, searches conducted without a warrant are deemed unreasonable. However, distinct exceptions to the search warrant requirement have been recognized, permitting police officers, under certain circumstances, to obtain incriminating evidence without a warrant.

Further, the right to counsel found in the Sixth Amendment and Section 10, Article I of the Ohio Constitution is not an absolute right. Counsel may have to be appointed for an indigent, as an example, but the appointment need not be a specific person in accordance with a defendant's choice.

Yet another example can be found in the Seventh Amendment and Section 5, Article I of the Ohio Constitution, pertaining to the right to trial by jury. The right to trial by jury is obviously a fundamental right but even given the breadth of the language " * * * the right of trial by jury shall be preserved * * *" (Seventh Amendment) and "[t]he right of trial by jury shall be inviolate * * *" (Section 5, Article I), we know that the right is not absolute but has been subject to reasonable restrictions, such as those found in Civ.R. 38, 47 and 48.

" 'Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interest of the community.' " *Kraus v. Cleveland* (1955), 163 Ohio St. 559, 561, 57 O.O. 1, 2, 127 N.E.2d 609, 610. In *Kraus,* quoting *Jacobson v. Massachusetts* (1905), 197 U.S. 11, 26, 25 S.Ct. 358, 361, 49 L.Ed. 643, 649–650, this court further observed that:

" ' * * * [T]he liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others.' " *Kraus v. Cleveland, supra,* 163 Ohio St. at 561–562, 57 O.O. at 2, 127 N.E.2d at 610–611.

There is no question that the drafters of both the federal and state Bill of Rights intended to grant to the people broad protections in many areas. These protections are imperative to the existence and continuance of our democratic society. Nevertheless, we must be cognizant that these freedoms, if made

absolute, might result in the creation of public safety problems. Hence, we must be able to draw a line when certain rights have foreseeable consequences of causing harm to others.

Therefore, based on the foregoing, we find that Section 4, Article I of the Ohio Constitution confers upon the people of Ohio the fundamental right to bear arms. However, this right is not absolute.

## E

### Police Power

The authority to regulate or limit constitutional guarantees has been commonly referred to as the police power. In Ohio, the grant of police power to a municipality is set forth in Section 3, Article XVIII of the Ohio Constitution, which provides that:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

This court has, on numerous occasions, stated the standards a court must follow in review of an enactment under the police power. See *Cincinnati v. Correll* (1943), 141 Ohio St. 535, 26 O.O. 116, 49 N.E.2d 412. See, also, *Kraus, supra,* and *Benjamin v. Columbus* (1957), 167 Ohio St. 103, 4 O.O.2d 113, 146 N.E.2d 854. In *Correll, supra,* 141 Ohio St. at 539, 26 O.O. at 118, 49 N.E.2d at 414, this court stated that:

"Laws or ordinances passed by virtue of the police power which limit or abrogate constitutionally guaranteed rights must not be arbitrary, discriminatory, capricious or unreasonable and must bear a real and substantial relation to the object sought to be obtained, namely, the health, safety, morals or general welfare of the public."

The ordinance in question was passed by virtue of the police power of the city of Cleveland. Section 628.01 of the ordinance, entitled "Findings," clarified, among other things, that the purpose sought to be obtained was the safety and welfare of the people of Cleveland. Section 628.01 provided that:

"The Council finds and declares that the proliferation and use of assault weapons [are] resulting in an ever-increasing wave of violence in the form of uncontrolled shootings in the City, especially because of an increase in drug trafficking and drug-related crimes, and pos[e] a serious threat to the health, safety, welfare and security of the citizens of Cleveland. The Council finds that the primary purpose of assault weapons is antipersonnel and any civilian application or use of such weapons is merely incidental to such primary antipersonnel purpose. The Council further finds that the function of this type of weapon is

such that any use as a recreational weapon is far outweighed by the threat that the weapon will cause injury and death to human beings. Therefore, it is necessary to establish regulations to restrict the possession or sale of these weapons. It is not the intent of the Council to place restrictions on the use of weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities."

Legislative concern for public safety is not only a proper police power objective—it is a mandate. This court has established that firearm controls are within the ambit of the police power. See *State v. Nieto* (1920), 101 Ohio St. 409, 413–415, 130 N.E. 663, 664, and *Mosher v. Dayton* (1976), 48 Ohio St.2d 243, 247–248, 2 O.O.3d 412, 414, 358 N.E.2d 540, 542–543. Accord *Hale, supra,* 63 Ohio App.3d at 376, 578 N.E.2d at 886.

In *Mosher, supra,* 48 Ohio St.2d at 247–248, 2 O.O.3d at 414, 358 N.E.2d at 542–543, this court concluded that an ordinance, which required individuals having or acquiring handguns to possess an identification card issued by the city of Dayton, was not violative of either Section 4, Article I or the Second Amendment. The court reasoned that neither the federal nor the state constitution states that the right to bear arms is supreme over the authority of a municipality under the police power. *Id.* at 248, 2 O.O.3d at 414, 358 N.E.2d at 543. The court further observed that the public purpose of the ordinance was to safeguard the public from the dangers of illegal weapons and, therefore, such weapons were a proper subject for *reasonable* regulation. *Id.* at 248, 2 O.O.3d at 414–415, 358 N.E.2d at 543.

That the right to bear arms is not an unlimited right and is subject to reasonable regulation is an accepted principle among other jurisdictions. See, generally, *Quilici, supra,* 695 F.2d at 268–269; *State v. Fennell* (1989), 95 N.C.App. 140, 143, 382 S.E.2d 231, 233; and *State v. LaChapelle* (1990), 234 Neb. 458, 460, 451 N.W.2d 689, 690. The majority of the cases which have decided this issue has taken the position that legislation which regulates or prohibits the possession or use of certain arms must be *reasonable* to be a valid exercise of the police power.

To meet the divergent needs and evolving conditions of society, legislation pursuant to the police power needs to be enacted. Almost every exercise of this authority will, in most if not all instances, interfere with a personal or collective liberty. Therefore, the test is one of reasonableness.[12] Here, the question is

---

12. We recognize that the term "reasonable" will be attacked as subjective, malleable and lacking in definitiveness. The word is, however, time-honored and well accepted in the law and is often used. Examples include the "reasonable man (person) standard," "reasonable speed," "reasonable control" and "reasonable force." Thus, we believe that reasonable gun control legislation is that which is

whether the legislation is a reasonable regulation, promoting the welfare and safety of the people of Cleveland.

In reviewing the reasonableness of an ordinance, we are guided by certain principles. It is not a court's function to pass judgment on the wisdom of the legislation, for that is the task of the legislative body which enacted the legislation. *Olin Mathieson Chem. Corp. v. Ontario Store* (1967), 9 Ohio St.2d 67, 70, 38 O.O.2d 163, 165, 223 N.E.2d 592, 594. Further, " '[u]nless there is a clear and palpable abuse of power, a court will not substitute its judgment for legislative discretion. Local authorities are presumed to be familiar with local conditions and to know the needs of the community.' " *Porter v. Oberlin* (1965), 1 Ohio St.2d 143, 149, 30 O.O.2d 491, 494, 205 N.E.2d 363, 368, quoting *Allion v. Toledo* (1919), 99 Ohio St. 416, 124 N.E. 237, syllabus.

Keeping the foregoing principles in mind, we believe that the ordinance, while admittedly broad in its scope, is a reasonable exercise of the municipality's police power. The ultimate objective of the legislation appears to be public safety. To reach this end, the municipality is attempting to limit the accessibility of certain generally recognized dangerous firearms.

Appellants and various *amici curiae* have presented numerous materials and statistical data, urging that the instant gun control legislation is not needed. However, even if the statistics presented are accurate, this does not diminish the public safety threat of assault weapons, or demonstrate that the ordinance is unreasonable or arbitrary. The prohibition of a harmful act need not be postponed until it occurs. *Benjamin, supra,* 167 Ohio St. at 112, 4 O.O.2d at 118, 146 N.E.2d at 861.

Any form of gun control legislation is destined to attract much attention. That does not change the fact that there must be some limitation on the right to bear arms to maintain an orderly and safe society while, at the same time, moderating restrictions on the right so as to allow for the practical availability of certain firearms for purposes of hunting, recreational use and protection. In our opinion, appellee has, under the present legislation, properly balanced these competing interests.

Appellants concede that appellee may regulate, within reason, the manner in which firearms are purchased or used. Appellants insist, however, that the ordinance under review goes beyond regulating the manner of acquisition and use and, instead, acts as a prohibition on the right to possess firearms, which is beyond the scope of the police power.

---

fair, proper, moderate, suitable under the circumstances and not excessive. See, generally, Black's Law Dictionary (6 Ed.1990) 1265.

Appellants' contention lacks merit. This court has commented that the police power includes the power to prohibit. See *Porter, supra,* 1 Ohio St.2d at 149, 30 O.O.2d at 495, 205 N.E.2d at 368; and *Benjamin, supra,* 167 Ohio St. at 109, 4 O.O.2d at 116, 146 N.E.2d at 859. See, also, *Fennell, supra,* 95 N.C.App. at 143–144, 382 S.E.2d at 233.

The ordinance at issue affects a class of firearms. Clearly, the city would have exceeded its authority under Section 3, Article XVIII, and would have violated Section 4, Article I if it had banned *all* firearms. For this reason, we are not persuaded by appellants' argument that by banning certain firearms "there is no stopping point" and legislative bodies will have "the green light to completely ignore and abrogate an Ohioan's right to bear arms."

Accordingly, we believe that appellants can prove no set of facts entitling them to relief.[13] Therefore, we find that former Cleveland Ordinance No. 415–89, prohibiting the possession and sale of "assault weapons" in the city of Cleveland, was a proper exercise of the police power under Section 3, Article XVIII of the Ohio Constitution and does not violate Section 4, Article I.

II

Supremacy Argument

Appellants contend that the ordinance violates Clause 2, Article VI of the United States Constitution. Specifically, appellants allege that the ordinance is at variance with Sections 4307 through 4313, Title 10, U.S.Code and Parts 543 and 544, Title 32, C.F.R.

Sections 4307 through 4313, Title 10, U.S.Code establish a Civilian Marksmanship Program ("CMP"). See Section 544.4(a), Title 32, C.F.R. Section 4307, Title 10, U.S.Code sets forth that the President may detail a commissioned officer of the Army or Marine Corps as director of civilian marksmanship ("DCM"). The DCM is to serve under the Secretary of the Army ("SA"). The SA is authorized, among other things, to provide for the operation and maintenance of rifle ranges, the instruction of citizens in marksmanship, and the promotion of practice in the use of rifled arms. Sections 4308(a)(1), (2) and (3).

---

13. In the case at bar, the record does not indicate that the trial court provided appellants with actual notice of its intent to convert appellee's motion to dismiss counts two through twelve of appellants' complaint to one for summary judgment. Further, it appears that the trial court granted appellee summary judgment with respect to counts two through twelve without any supporting or opposing evidence provided by appellee. Nevertheless, we believe that under the circumstances of this case, the failure to provide notice and the granting of summary judgment were not prejudicial where the motions to dismiss should have been granted in the first instance.

Part 543, Title 32, C.F.R. is entitled "Promotion of Rifle Practice." The purpose of this regulation is to govern the SA's "program for promoting marksmanship training with rifled arms among citizens of the United States." Section 543.1. This includes classes of instruction and the issue of arms, ammunition and other necessary supplies. Table 1 to Subpart A of Part 543. Subpart B of Part 543 provides for the organization and enrollment of shooting clubs. The DCM has management control of the program, providing support and assistance to the shooting clubs who participate in the program. Section 543.5. Section 543.10 addresses the issuance of government-owned materials. Clubs that comply with Part 543 may be issued marksmanship training materials. Section 543.10(a). However, all government property is dispersed to affiliated clubs and not to individuals. *Id.* Such property is to be used solely for supporting the club's program. *Id.* Section 543.17 details the care and safekeeping of arms, ammunition and equipment. This section specifies that the club officer and designated leader of affiliated clubs are responsible for the care and safekeeping of government property issued, which includes maintaining the property and preventing the property's misuse or use by unauthorized persons. Section 543.17(a)(1) and (2). Further, paragraph (g)(5)(v) of Section 543.17 provides, in part, that storage will "conform to local ordinances and regulations * * *," and Paragraph (g)(5)(vi) provides that "[s]torage at a military or law enforcement facility is encouraged when deemed feasible by the club." Section 543.23 directs that civilian organizations are responsible for furnishing their own arms and ammunition.

Part 544, Title 32, C.F.R. is entitled "Civilian Marksmanship." The purpose of this regulation is to prescribe the "policies, procedures, and responsibilities for the National Matches and other excellence-in-competition * * * matches." Section 544.1. National matches are conducted as part of the CMP. Section 544.4(a). Further, as part of the CMP, "these matches are intended to promote the national defense. The CMP provides and encourages voluntary marksmanship traning [*sic*] for persons who are not reached by training programs of the Armed Forces and who might be called into service in an emergency." Section 544.4(b). Section 544.9 states that matches will be held at Camp Perry (Port Clinton, Ohio), or at other places recommended by the DCM and approved by the SA. The types of firearms to be used are described in Section 544.52. Rifles that may be used are the caliber .30 M1 series, the caliber 7.62mm M14 series, and the caliber 5.56mm M16 series. Competitors may use these rifles as issued by the U.S. Army or commercial equivalents. Sections 544.52(a), (b) and (c). Those competitors who use the 7.62mm M14 series or 5.56mm M16 series or the commercial equivalents are required to use the standard twenty- or thirty-box magazine when firing during a match. Section 544.52(c)(5). Pistols that may be used are the caliber .45M1911 or M1911A1. Section 544.52(d). Competitors may

use these pistols as issued by the U.S. Armed Forces or, as with rifles, a commercial equivalent. *Id.* All ammunition used by the competitors is to be issued by the government. Section 544.57.

When considering the constitutionality of a local ordinance under the Supremacy Clause, we start with the fundamental principles that the ordinance in question is to be analyzed as if it were a law with statewide application, *Hillsborough Cty. v. Automated Med. Laboratories, Inc.* (1985), 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 721, and that the local police powers are not to be assumed to be displaced by federal law absent a clear and manifest purpose of Congress, *Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459.

Congressional intent to preempt state or local authority can be drawn from the explicit terms of the federal law. *Wisconsin Pub. Intervenor v. Mortier* (1991), 501 U.S. ——, ——, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532, 542. Further, intent can be derived implicitly "if a scheme of federal regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' if 'the Act of Congress * * * touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or if the goals 'sought to be obtained' and the 'obligations imposed' reveal a purpose to preclude state authority." *Id.* at ——, 111 S.Ct. at 2481–2482, 115 L.Ed.2d at 542–543, citing *Rice, supra,* 331 U.S. at 230, 67 S.Ct. at 1152, 91 L.Ed. at 1459.

In addition, we are aware that "[e]ven when Congress has not chosen to occupy a particular field, pre-emption may occur to the extent that state and federal law actually conflict. Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248, 257] (1963), or when a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' *Hines v. Davidowitz,* 312 U.S. 52 [61 S.Ct. 399, 85 L.Ed. 581] (1941)." *Wisconsin Public Intervenor, supra,* 501 U.S. at ——, 111 S.Ct. at 2482, 115 L.Ed.2d at 543.

Appellants' Supremacy Clause argument is not premised on the proposition that Sections 4307 through 4313, Title 10, U.S.Code and the federal regulations associated with the federal law, either explicitly or implicitly, preempt the ordinance. Instead, appellants urge that the ordinance stands as an obstacle to the achievement of the CMP's purposes and objectives. We disagree.

In essence, the federal law was enacted to promote marksmanship training among citizens of the United States and to promote the national defense through competition. It is clear to us that the federal law and regulations anticipated an alliance between federal and local governments.

In particular, with respect to promoting marksmanship training with rifled arms among United States citizens, Congress explicitly provided that firearms issued to affiliated clubs participating in the CMP must be stored in compliance with local ordinances, Section 543.17(g)(5)(v), that supervisory personnel must enforce "compliance with local safety and other regulations," Section 543.-22(a)(1)(ii), and that violations of local firearm regulations are grounds for denying the affiliation of a shooting club with the CMP, Section 543.9(d)(1)(iii)(D). Further, federal law supports the use of rifles for target practice. As the ordinance made plain, it was not the intent of the council members to preclude the use of all firearms for target practice.

The court of appeals concluded, and we agree, that the ordinance did not impede marksmanship training in the city of Cleveland since the people of Cleveland could practice marksmanship without those firearms that have been classified as "assault weapons." Additionally, we also agree with the court of appeals that the ordinance does not stand in the way of competitions which were intended to promote the national defense. The people of Cleveland, by virtue of the ordinance, were not prohibited from competing in national matches. This is evident by the fact that certain firearms could have been loaned by authorities to participants. Section 544.53.

Thus, we hold that former Cleveland Ordinance No. 415–89 does not violate the Supremacy Clause to the United States Constitution.

### III

### Conclusion

Therefore, based on the foregoing, it is ordered that final judgment be entered for appellee.

*Judgment accordingly.*

Moyer, C.J., A.W. Sweeney, Wright and Resnick, JJ., concur.

Hoffman and Pfeifer, JJ., concur in part and dissent in part.

William B. Hoffman, J., of the Fifth Appellate District, sitting for F.E. Sweeney, J.

William B. Hoffman, J., concurring in part and dissenting in part. Though I concur with the first, second and fourth syllabus paragraphs of the majority opinion, I must respectfully dissent from the majority's conclusion that former Cleveland Ordinance No. 415–89 is constitutional. I believe such decision is premature and analyzed under the wrong standard by the majority.

The majority correctly recognizes that Sections 1 and 4, Article I of the Ohio Constitution confer upon the citizens of Ohio the fundamental right to bear arms and that such right is an individual one. Conceded to the majority is the fact that, although fundamental, such right is not absolute.

It is undisputed that legislative concern for public health and safety is a proper police power objective. This court has recognized as constitutional gun control legislation which has regulated the manner in which a weapon may be borne. *State v. Nieto* (1920), 101 Ohio St. 409, 130 N.E. 663; *Mosher v. Dayton* (1976), 48 Ohio St.2d 243, 2 O.O.3d 412, 358 N.E.2d 540. However, the Cleveland ordinance goes beyond mere regulation. It is a total prohibition of possession of certain types of arms.

The majority adopts the position that as long as the legislation is enacted to promote public health and safety it need only be reasonable to pass constitutional muster, even though it interferes with a personal or collective liberty. Such standard is appropriate when analyzing legislative restrictions on nonfundamental rights. However, I believe a stricter standard must be utilized when the legislation places restrictions upon fundamental rights, particularly where the legislation prescribes an outright prohibition of possession as opposed to mere regulation of possession. A "strict scrutiny" test, *i.e.*, whether the restriction is *necessary* to promote a *compelling governmental interest*, as opposed to the less demanding "reasonable" or "rational relationship" test, ought to be applied. *Dunn v. Blumstein* (1972), 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274. Under the strict scrutiny analysis, a law which impinges upon a fundamental right is presumptively unconstitutional unless a compelling governmental interest justifies it. *Skinner v. Oklahoma ex rel. Williamson* (1942), 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655; *Shapiro v. Thompson* (1969), 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600; *San Antonio Indep. School Dist. v. Rodriguez* (1973), 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16. Furthermore, any such infringement must be drawn with "precision." *N.A.A.C.P. v. Button* (1963), 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405, 421. "And if there are other, reasonable ways to achieve those goals with a lesser burden on a constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'" *Dunn, supra,* 405 U.S. at 343, 92 S.Ct. at 1003, 31 L.Ed.2d at 285, citing *Shelton v. Tucker* (1960), 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237. Exercise of the police power may not be achieved by a means which sweeps unnecessarily broadly. *Lakewood v. Pillow* (1972), 180 Colo. 20, 501 P.2d 744. The majority candidly recognizes that the Cleveland ordinance is broad in its scope.

Whether the city of Cleveland's objective in enacting the subject ordinance is necessary to promote a compelling governmental interest and whether the

legislation enacted to accomplish that objective sweeps unnecessarily broadly are questions which are not yet ripe for review by this court in light of the procedural posture of this case. As noted in the majority opinion, the trial court converted appellee's motion to dismiss appellants' counts two through twelve of the complaint into a motion for summary judgment. Civ.R. 12(B) provides in pertinent part:

"When a motion to dismiss for failure to state a claim upon which relief can be granted presents matters outside the pleadings and such matters are not excluded by the court, the motion shall be treated as a motion for summary judgment and disposed of as provided in Rule 56. * * * All parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 56."

In order to prevail on a Civ.R. 12(B)(6) motion, it must appear beyond doubt from the complaint that the plaintiff could prove no set of facts entitling him to recover. *Petrey v. Simon* (1983), 4 Ohio St.3d 154, 4 OBR 396, 447 N.E.2d 1285. I believe appellants' second amended complaint adequately challenged the constitutionality of the ordinance and was sufficient to withstand appellee's motion to dismiss. Though the trial court could properly treat appellee's motion for dismissal as a summary judgment motion, when doing so it denied *both parties* the opportunity to present materials pertinent thereto.[14] The briefs of the parties and respective *amici* filed herein are replete with statistics and reports collected throughout the country regarding the impact of guns and their relationship to criminal behavior. The majority makes reference to these materials but concludes that even if accurate, they would not diminish the public safety threat of "assault weapons" or demonstrate that the ordinance is unreasonable or arbitrary. Though the majority's position may ultimately be proven correct, the parties have been precluded from establishing their record in the courts below.

Few would question the wisdom of banning "assault weapons." However, use of the term "assault weapons" generates emotional responses and inherent bias. Whether the weapons banned by the Cleveland ordinance are primarily antipersonnel or whether they are equally suitable for defensive or sporting purposes has yet to be demonstrated. All weapons are antipersonnel and assaultive by nature. The mere declaration by Cleveland Council that it finds the primary purpose of assault weapons to be antipersonnel and any civilian application or use of those weapons is merely incidental to such primary antipersonnel purpose, coupled with its declaration that the proliferation and use of said assault weapons pose a serious threat to the health, safety, welfare and security of the citizens of

---

14. The majority and the appellate court overruled this procedural argument as not prejudicial because the motion to dismiss ought to have been granted.

Cleveland is, standing alone, insufficient to satisfy the government's burden when such legislation infringes upon a fundamental right. When challenged, the government must be allowed to demonstrate this claim and the challenger must be afforded an opportunity to demonstrate otherwise. Both sides have been precluded from doing so in this case.

I would reverse the decision of the appellate court, and remand the matter to the trial court for further proceedings in accordance with this opinion and the law.

PFEIFER, J., concurs in the foregoing opinion.