OPINION
In May of 1986, appellee, Daniel Williams, entered a plea of guilty to one count of rape, R.C. 2907.02, and one count of aggravated burglary, R.C. 2911.11. He was sentenced by the Lake County Court of Common Pleas to serve a prison term of seven to twenty-five years. In March of 1997, the Department of Corrections recommended that appellee be adjudicated a sexual predator under Ohio's version of Megan's Law, Am.Sub.H.B. No. 180, 146 Ohio Laws, Part II, 2560 (effective date January 1, 1997). The record indicates that a classification hearing under R.C.2950.09(C)(1) was scheduled. Court-appointed counsel filed a motion to dismiss the proceedings, arguing that applying Megan's Law to those convicted under prior law violated the Ex Post Facto Clause of the United States Constitution and the Retroactivity Clause in Section 28, Article II of the Ohio Constitution. The trial court agreed and granted appellee's motion to dismiss. The state has appealed.
In State v. Crawford (Sept. 25, 1998), Lake App. No. 97-L-245, unreported, this court agreed with the argument that applying Megan's Law to those convicted under prior law was unconstitutional. On pages 18 and 19 of the Crawford opinion, we also noted that Megan's Law may have violated Section 1, Article I
of the Ohio Constitution. Under the authority of Crawford, we would have affirmed the trial court's judgment.
However, five days after our decision in Crawford, the Supreme Court of Ohio rendered its decision in State v. Cook (1998),83 Ohio St.3d 404, wherein the court decided that applying Megan's Law to those convicted under prior law did not offend either the Ex Post Facto Clause or the Retroactivity Clause; therefore, the Supreme Court has rejected the grounds on which the trial court relied.
The Supreme Court has repeatedly held that an appellate court is not authorized to reverse a correct judgment merely because erroneous reasons were assigned for it. State ex rel. Fattlar v.Boyle (1998), 83 Ohio St.3d 123, 125; State ex rel. McGinty v.Cleveland City School Dist. Bd. of Edn. (1998), 81 Ohio St.3d 283,290; State ex rel. Kaylor v. Bruening (1997), 80 Ohio St.3d 142,144. In the case at bar, the trial judge harbored honest reservations about the constitutionality of Megan's Law and he courageously voted his conscience. Many Ohio judges, including several members of this court, share those concerns. We have therefore taken the trial judge's lead, and we affirm his decision to dismiss the pending sexual predator proceedings against Williams on the authority of the secondary point raised inCrawford, and not considered in Cook, that Megan's Law violates Section 1, Article I of the Ohio Constitution.
In Arnold v. Cleveland (1993), 67 Ohio St.3d 35, the Supreme Court noted a trend among state courts to rely on their own state constitutions when deciding civil liberties cases, as well as its own reluctance, in the past, to do the same. It quoted, with approval, the statement in Davenport v. Garcia (Tex. 1992)834 S.W.2d 4, 12 that interpreting a state constitution as merely a restatement of the federal constitution "`both insults the dignity of the state charter and denies citizens the fullest protection of their rights.'" Arnold at 42. The court therefore joined the other states, and our justices unanimously concurred in the first paragraph of the syllabus, which states:
 "The Ohio Constitution is a document of independent force. In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall. As long as state courts provide at least as much protection as the United States Supreme Court has provided in its interpretation of the Federal Bill of Rights, state courts are unrestricted in according greater civil liberties and protections [under state constitutions] to individuals and groups."
In State v. Robinette (1997), 80 Ohio St.3d 234, the court qualified its approach somewhat, stating that "where the provisions [of the federal and state constitutions] are similar" and where "no persuasive reason for a differing interpretation is presented," the court has interpreted the Ohio Constitution to be co-extensive with the Constitution of the United States. Id. at 238. The Robinette court then held that the search and seizure provisions of Section 14, Article I of the Ohio Constitution provided no more protection than the Fourth Amendment to the federal constitution because "[t]he language of [the two provisions] is virtually identical." (Footnote omitted.) Id.
The only way to reconcile the Arnold and Robinette opinions is to say that the Ohio Constitution is co-extensive with the federal constitution, and affords no greater rights, where their respective provisions are "virtually" identical. Robinette. If the provisions of the Ohio Constitution differ from those of the federal constitution, then Ohio courts are free to interpret them as affording greater protections than their federal counterparts.Arnold.
In Preterm Cleveland v. Voinovich (1993), 89 Ohio App.3d 684,691, Judge Whiteside wrote:
 "Section 1, Article I, Ohio Constitution, together with Section 2, Article I, Ohio Constitution (together originally contained in Section 1, Article VIII of the 1802 Ohio Constitution), make it quite clear that, under Ohio's Bill of Rights, every person has inalienable rights under natural law
which cannot be unduly restricted by government, which is formed for the purpose of securing and protecting those rights, and that all governmental power depends upon the consent of the people. Thus, the Ohio constitutional provision is broader in that it appears to recognize so-called `natural law,' which is not expressly recognized by the [federal] Bill of Rights or any other provision of the United States Constitution, although it is recognized in the Declaration of Independence. In that sense, [Section 1, Article I of] the Ohio Constitution confers greater rights than are conferred by the United States Constitution * * *." (Emphasis added and footnote omitted.)
We agree that the rights protected by Section 1, Article I are deemed to be "inalienable," whereas that word does not appear anywhere in the United States Constitution. Therefore, Section 1, Article I is unique. Accordingly, Ohio courts may give it a unique construction under the doctrine of "New Federalism" adopted in Arnold. Federal constitutional law is therefore inapplicable, and we must seek Ohio precedent to understand and apply Ohio's guarantee.
When the settlers in the eastern part of the Northwest Territory formed our state government, they delegated their inherent police power to the General Assembly. But the lessons of the American Revolution were still fresh in their minds, so they incorporated a Bill of Rights into the nascent constitution to make sure that the state government would not disregard human rights as the British Parliament had disregarded them. State v.Nieto (1920), 101 Ohio St. 409, 417, 419-420 (Wannamaker, J., dissenting). See, also, State ex rel. Bruestle v. Rich (1953),159 Ohio St. 13, 24 ("one of the purposes of a constitution is to curb government power"). Section 1, Article I, the very first provision of the Bill of Rights, is one of the specific limitations on the state's police power. Daugherty v. Wallace
(1993), 87 Ohio App.3d 228, 235-236. It guarantees that all citizens have the right to freedom and to the protection of property and reads:
 "All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."
In Benjamin v. Columbus (1957), 167 Ohio St. 103, paragraph five of the syllabus, the Supreme Court articulated principles established by its precedents interpreting Ohio's Constitution and set forth a two-part test for the validity of police power legislation:
 "Although almost every exercise of the police power will necessarily either interfere with the enjoyment of liberty or the acquisition, possession and protection of property, within the meaning of Section 1 of Article I of the Ohio Constitution, or involve an injury to a person within the meaning of Section 16 of Article I of the [Ohio] Constitution, * * *, an exercise of the police power having such an effect will be valid if [1] it bears a real and substantial relation to the public health, safety, morals, or general welfare of the public and if [2] it is not unreasonable or arbitrary."
Megan's Law is clearly an exercise of the state's police powers. See State v. Cook, 83 Ohio St. at 417.[1] Some of the language in Cook can be interpreted as saying Megan's Law bears a real and substantial relation to the legislature's legitimate goal of protecting the public. We agree. Repeat sex offenders represent a genuine threat to public safety. The General Assembly was right to have tried to combat that danger.
The Cook opinion did not, however, address the second prong of the Benjamin test. That portion of the test is not mere dicta. In fact, the Supreme Court has a long and distinguished history of invalidating legislation on the ground that, although it may arguably bear some rational relationship to the public health, safety, morals, or the general welfare, the enactment encroached too far onto the civil liberties of those it governed. See, e.g.,Sipe v. Murphy (1892), 49 Ohio St. 536 (invalidating an ordinance regulating auctioneers of foreign jewelry because "its passage was not a reasonable exercise of the police power")[2]; Mirick v.Gims (1908), 79 Ohio St. 174 (invalidating a property tax levied on the number of dogs kept on the property even if the owner of the property does not know the dogs are there, as where they are kept by a tenant, because "To us [the tax] seems to be inequitable, arbitrary and unreasonable, unnecessarily infringing upon the natural and inalienable rights of citizens, and therefore void.")[3]; State v. Boone (1911), 84 Ohio St. 346 (holding that, although a statute requiring midwives and physicians attending births to collect information useful to the Bureau of Statistics "[bore] some relation to the public welfare," the law was nevertheless invalid because "it is within the judicial power to declare void an unnecessary and unreasonable exercise of police power."); In the Matter of: Steube (1914), 91 Ohio St. 135
(invalidating a statute requiring the sale of certain food stuffs to be by whole avoirdupois weight, even where the parties have openly agreed on a fractional weight, on the ground that "this act places an unreasonable and burdensome obligation upon persons engaged in a lawful business and is an unwarranted exercise of the police power.")[4]; East Fairfield Coal Co. v. Booth (1957),166 Ohio St. 379 (agreeing with the lower courts that a zoning ordinance flatly prohibiting strip mining in an agricultural district was "unreasonable and arbitrary")[5]; Mominee v.Scherbarth (1986), 28 Ohio St.3d 270 (invalidating a statute providing an absolute four-year statute of repose on medical malpractice claims held by children on the independent ground that it was unreasonable and "patently arbitrary."); Gaines v.Preterm-Cleveland, Inc. (1987), 33 Ohio St.3d 54 (invalidating the same four-year statute of repose at issue in Mominee as applied to adults who discovered their cause of action within the four years but who were left with less than a year to file suit because, "[a]lthough it may be stated that this severance of rights might conceivably bear `a real and substantial relation to the * * * general welfare of the public'" by reducing tort litigation, "the means of achieving [that end] are unreasonable and arbitrary.");Burgess v. Eli Lilly Co. (1993), 66 Ohio St.3d 59 (holding that, although a statute of limitations for DES claims that ran from the date of injury irrespective of when the plaintiff discovered his malady bore some relationship to the legitimate goal reducing tort litigation, the statute was nevertheless invalid because it "unreasonably and arbitrarily limits the rights of DES victims.").
In the third paragraph of the syllabus of the seminal case ofFroelich v. Cleveland (1919), 99 Ohio St. 376, the Supreme Court stated that police power legislation is "unreasonable" in the constitutional sense if it "interfere[s] with private rights beyond the necessities of the situation" or if it is "unduly oppressive upon individuals." The court used the Froelich
definition in Direct Plumbing Supply Co. v. Dayton (1941),138 Ohio St. 540, to invalidate the infamous "sticker ordinance." The Dayton City Council used its police powers to enact an ordinance that required purchasers of plumbing fixtures to disclose their names, addresses, and the addresses of the residence at which the proposed installation is to take place; that required the sellers of the fixtures to make weekly reports of that information to the city plumbing inspector; and that required all fixtures sold bear the inspector's sticker of approval. The court held that, although it bore some marginal relation to the legitimate goal of enforcing other plumbing regulations, "the burdens of the [sticker] ordinance are unduly oppressive upon individuals and interfere with the rights of private property and freedom of contract beyond the necessities of the situation." Id. at 549.
Applying the Froelich definition of "reasonableness," we conclude that Megan's Law is unconstitutional on its face because it unreasonably interferes with the rights of individuals beyond the necessities of the situation, and because in our opinion the statutory scheme is unduly oppressive.
R.C. 2950.11(B) requires the sheriff to send a notice of the offender's pending release from prison to the community where he intends to live. The notice must contain certain information about the offender, including his name, the address at which he will reside, and the sexually oriented offense for which he has been found to be a "predator." We note that there is no requirement that the sheriff provide the community with a photograph of the offender. Thus, the notice does nothing to help the members of the community to keep a watch for the "predator" in case he tries to abduct a loved one. Instead, the notice is apparently intended to trigger a response by the community to (1) seek out more information about their rights as potential victims, (2) counsel and educate their children as to the dangers posed by strangers, and (3) initiate "constructive" plans, whatever those may be. See R.C. 2950.02(A)(1).
But these three purposes could be served by giving notice that an unspecified person who has been convicted of a particular crime is due to move into an unspecified residence nearby. With such notice, the neighbors would be equally alerted to any potential danger. The unspecific notice would adequately trigger the legislature's desired community response to prepare themselves.
Singling the offender out by name and by address and calling him a "predator" needlessly infringes on the rights of individuals in several important respects.
First, as the Cook court noted, sending notice of the offender's name, address, and crime "could have a detrimental effect on offenders, causing them to be ostracized and subjecting them to embarrassment or harassment." State v. Cook,83 Ohio St. 3d at 418.[6] In Housh v. Peth (1956), 165 Ohio St. 35, the Supreme Court held that all persons have a right of privacy. It quoted the syllabus of Pavesich v. New England Life Ins. Co.
(l905), 122 Ga. 190, 50 S.E. 68, for the proposition that "A right of privacy is derived from natural law". According to Judge Whiteside, "natural law" is incorporated into Section 1, Article I. Preterm Cleveland v. Voinovich, supra. Therefore, the right of privacy is an inalienable right that is protected by Ohio's Constitution. The right of privacy means "a right to be let alone." Housh, at the syllabus. Furthermore, all persons have the right to "adopt a life of seclusion with a right to remain undisturbed if [he or] she so desires." Id. at 39. If the notice, as written, subjects the offender to harassment, they have been needlessly deprived of their constitutional right to remain undisturbed.
Second, when given notice that a prior offender plans to move into a certain address, the neighbors might take concerted action to prevent the offender from obtaining title to that residence. Thus, the notice provision needlessly interferes with the individual's right to acquire property that is guaranteed as inalienable under Section 1, Article I of the Ohio Constitution. Cf. Porter v. Oberlin (1965), 1 Ohio St.2d 143 (upholding an ordinance prohibiting landlords from discriminating against black people on the ground that the ordinance protects their constitutional right to acquire property). In a similar vein, if the neighbors take it upon themselves to damage or destroy the offender's house in an effort to convince him to move out, then it can be said the notice provision needlessly interferes with the individual's right to protect his property that is also guaranteed by Section 1, Article I of the Ohio Constitution.
Third, we noted in Crawford, at page 18, that the practical effect of R.C. Chapter 2950 is that the offender may not be able to hold a certain job or to work freely in this society. The right to pursue happiness guaranteed in Section 1, Article I of the Ohio Constitution has been interpreted to encompass the right to pursue a business or occupation. Frecker v. Dayton (1950),153 Ohio St. 14, 17. Community notification needlessly interferes with that right.
R.C. 2950.11(B)(1) and (2) unreasonably interferes with the privacy, property, and liberty interests of the individual beyond the necessities of the situation.
R.C. 2950.11(B)(4) requires the sheriff to state in the notice that the offender has been found to be a "predator." Webster's Third International Dictionary (1986), 1785 gives one of the definitions of the word "predator" as "an animal that depends on predation for its food." In essence, the General Assembly has created a procedure by which human beings are publicly branded as being "animals." This is slanderous. State v. Cook,83 Ohio St.3d at 419 (community notification procedure "is obviously detrimental to the reputation of the defendant, who is presumed innocent until proven guilty."). In Kintz v. Harringer (1919), 99 Ohio St. 240,244, the court stated:
 "Before we ever had an English Magna Charta, or an American Bill of Rights in the form of a constitution, federal or state, one of the most sacred rights of the citizen was the right to a good name and reputation and to be protected in the enjoyment of that good name and reputation."
Furthermore, the court called the right to reputation a "primary and precious right solemnly proclaimed in Holy Writ, in the lives and literature of our own people * * *." Id. at 245.[7] We understand these comments to mean that a person's right to the enjoyment of his reputation is as fundamental as the right of privacy recognized in Housh. It, too, is a "natural law" right that is protected by Section 1, Article I of the Ohio Constitution. The right to one's reputation is also explicitly protected in Section 16, Article I. Surely, the General Assembly can accomplish its stated purposes to warn the public without name-calling. R.C. 2950.11(B)(4) unreasonably interferes with the constitutional rights of the individual in the enjoyment and protection of his reputation to a degree beyond the necessities of the situation.
The Housh court also held that any conduct that would cause shame or humiliation to a person of ordinary sensibilities or that would subject him to public harassment is an actionable tort. Id.
at 39. In addition, Section 16, Article I of the Ohio Constitution guarantees that, for any injury done to a person's reputation, he shall have a remedy by due course of law. The General Assembly has authorized the county sheriffs to broadcast notices that a certain person is an "animal," a practice which undoubtedly causes shame and humiliation, and which injures the reputation of the person mentioned in the notice. Yet, R.C.2950.12 cloaks the sheriffs with immunity from liability for any act under R.C. Chapter 2950. The immunity provision unreasonably interferes with the individual's constitutional right to a redress of his legal grievances beyond the necessities of the situation.
The General Assembly may not completely repeal the fundamental and inalienable rights of any particular class of persons. InColumbus v. DeLong (1962), 173 Ohio St. 81, 83, the Supreme Court observed that "a prostitute, no matter how reprehensible her mode of life, is a human being with rights protected by the Constitution." We do not believe this statement is merely empty rhetoric. A sex offender is equally human and is no less deserving of the protections afforded to everyone.
For these reasons, we hold the community notification provisions in 2950.11(B) are unreasonable and constitute an invalid exercise of the police power.
R.C. 2950.11(A) requires the sheriff to give a written notice regarding the "predator" to the executive officer or hiring coordinator of community agencies listed in R.C. 2950.11(A)(2) through (7). These are public children services agencies, the boards of education of the local school district, private schools, preschool programs, day-care centers, and colleges. Again, no photograph of the "predator" is sent to these agencies, so they cannot be expected to keep watch for him in case he tries to abduct a child or college student. These notices are apparently designed to warn the executive officers and the personnel coordinators not to hire the "predator." But this purpose can be accomplished without slandering potential applicants. A simple background check should uncover whether an applicant for employment has ever been convicted of a sex offense. Broadcasting a notice to the agencies about every person who has been convicted of a sex offense regardless of whether or not they have applied for employment unreasonably interferes with the reputation, liberty, and privacy rights of the individual beyond the necessities of the situation.
R.C. 2950.06(B)(1) requires sexual "predators" to verify their current residence every ninety days. Verification, like the initial registration, "allows law enforcement officials to remain vigilant against possible recidivism by the offender." State v.Cook, 83 Ohio St.3d at 417. Such frequent verification is unnecessary, however, because R.C. 2950.05(A) also requires "predators" to file a written notice of any change of address with the sheriff. There was no verification requirement in the 1963 version of the Habitual Sexual Offender statute. See Am.Sub.S.B. No. 160, 130 Ohio Laws 669. The offender was required to register his address with the sheriff upon being released from prison, and to file a notice when that address changed. Between those times, it can logically be inferred that the offender is still living at the address originally given. Requiring a "predator" to verify his address every ninety days tells the sheriff what he already knows. Thus, the ninety-day verification requirement does nothing to enhance the information already possessed by law enforcement officials. And yet the "predators" are required to personally appear and fill out verification forms to give the sheriff redundant information. The ninety-day verification requirement for the offender's current address in R.C. 2950.06(B)(1) unreasonably interferes with the liberty of the individual beyond the necessities of the situation.
R.C. 2950.06(C) requires the "predator" to personally appear at each ninety day verification. But that statute also gives the sheriff discretion to mail the "predator" a "non-forwardable" address/employment verification form. The "predator" is required by law to complete the form and take it personally to the sheriff. He may not mail the form back. The underlying purpose of the law, to provide the sheriff with information, can be achieved equally well if the "predator" mails the form to the sheriff. Requiring the "predator" to personally appear has no functional purpose other than harassing and inconveniencing him. The personal appearance provisions of R.C. 2950.06(C) relating to verification unreasonably interfere with the liberty of the individual beyond the necessities of the situation.
R.C. 2950.07(C) provides that if the "predator" is in the future convicted of another sex crime, and is labeled a "predator" with respect to that other crime, he is to independently comply with the registration and verification schedule of each offense. If those schedules do not co-coincide, the "predator" is required, in essence, to double the frequency with which he appears and verifies his address and employment. Instead of giving the sheriff redundant information four times a year, he is required to do so eight times a year. The independent compliance provision of R.C. 2950.07(C) unreasonably interferes with the liberty of the individual beyond the necessities of the situation.
We also think it unreasonable for the General Assembly to require that county governments maintain such elaborate record-keeping and ministerial procedures without a correspondingly worthwhile benefit to public safety. The law is unduly and unnecessarily burdensome upon government agencies.
The combined effect of the foregoing provisions, and several more cited below, shows that Megan's Law is unduly oppressive upon the individual.
By this statute, the legislature has essentially proclaimed (to paraphrase Holmes[8]) that the typical sex offender is a degenerate, bound to impose himself on others by as deep-seated an organic necessity as that which makes the rattlesnake bite, and that it is idle to talk about reforming his character by traditional methods of punishment. See R.C. 2950.02(A)(2). The legislature has therefore provided various mechanisms by which he can be de-humanized in a court of law and branded as being a "predator," which is commonly understood as meaning he is an "animal." R.C. 2950.09(A), (B) and (C).
The procedures so established are not reserved merely for the likes of the killer of Megan Kanka. A person who commits any type of sex offense is subjected to the same treatment. Even comparatively petty offenders, like those convicted of misdemeanor offenses such as pandering sexually oriented matter involving children, corrupting a minor, or child endangering, are equated to serial rapists and murderers. See R.C. 2950.01(D)(2). They are all "animals" under this statute, irrespective of whether or not their crime was violent. And it does not take more than one conviction to earn that appellation, for it can apply even to first-time offenders. See R.C. 2950.01(E).
After the prior offender has served his prison sentence for the underlying sex offense, and thereby has paid his debt to society, the General Assembly does not let him return quietly to the law-abiding life which, presumably, he will lead. The prior offender is made to appear personally at the office of his local sheriff, or perhaps at the county jail, R.C. 2950.04(A)(1), and there to sign a paper stating he is an "animal." R.C.2950.04(C)(1). He is made to surrender certain information regarding where he intends to make his home and where he intends to work. R.C. 2950.04(C). He also must surrender the license plate numbers of any vehicles he owns. R.C. 2950.04(C)(2).
Soon after, certain officials broadcast a warning to the members of his community. R.C. 2950.11(A). The community is told that an "animal" is on his way, R.C. 2950.11(B)(4), and that they should take whatever measures as are necessary to protect themselves. He is singled out in the notice. His name and address are there for all to see. R.C. 2950.11(B)(1) and (2). His neighbors are thereby enabled to harass and annoy him. A vandal or an arsonist can easily find his residence. Vigilantes can find him and/or his family, who suffer the same invasions as he. Like Hester Prynne in Hawthorne's The Scarlet Letter (1850), he and his family are exposed to shame, humiliation, and "the sting of public censure". State v. Cook, 83 Ohio St.3d at 423.
If the climate in his neighborhood becomes too hostile, he cannot simply move elsewhere, because the local authorities of other communities will again announce his coming. R.C.2950.11(A).
Even though public officials continually commit actionable torts upon him, the prior offender is denied access to the courts, and he may not sue them for his damages. R.C. 2950.12.
In the meantime, the prior offender is required every ninety days to personally appear at the offices of the sheriff's department, or perhaps at the county jail, and to re-submit information regarding his residency and employment. R.C.2950.06(A) and (D). He is made to do this not for any good reason, for the officers there already have that information; but to surround him with a police presence, and to remind him, in the words of George Orwell, that "BIG BROTHER IS WATCHING YOU." 1984
(1949). If he fails to appear on schedule, he is to be charged with an independent crime, R.C. 2950.99, and the sheriff is commanded to seek a warrant and to immediately hunt him down and arrest him. R.C. 2950.06(G)(2)(b). If he is again convicted, he is made to double the number of times he is to appear. R.C. 2950.07(C).
Although the prior offender may try and throw himself on the mercy of the court which adjudicated him to be an "animal," R.C.2950.09(D)(1), he cannot easily obtain judicial relief. He is required by statute to prove by clear and convincing evidence that it is unlikely that he will commit another offense. Id. The legislature has declared that there is a high chance that he will re-offend; he has done so at least once before. No expert can definitively prove that he will never again do the same. Once placed on the rolls of sexual "predators," he has little real hope of getting off.
If he fails his first attempt, he cannot apply again for official absolution for another five years. R.C.2950.09(D)(1)(b). If he cannot marshal the requisite evidence of his innocence, he is condemned to live out the rest of his days under the burdens of the statute. R.C. 2950.07(B)(1).
This is not some fanciful tale appearing in a work of fiction. This is the reality of life in Ohio for some of her citizens created in the aftermath of Megan's Law. If the legislature's treatment of sex offenders is constitutionally permissible, then nothing stops it from enacting similar provisions for any other kind of person whom the General Assembly finds undesirable. In that sense, we act not only to protect the rights of those persons convicted of sex offenses, but we act to protect the rights of everyone.
When considering the validity of Megan's Law, we are called upon to decide the tenor of the society in which we are going to live. This legislation sailed through the General Assembly with only token opposition in the House of Representatives and none at all in the Senate.[9] It was propelled by an incredible gale of public outrage and frustration over the inability of the criminal justice system to deal with sex offenders. Those who succumbed to the political winds and supported Megan's Law are apparently willing to tolerate an accelerated legislative pace, to accept the consequences of ill-considered laws, and consequently to live in a paranoid society that approaches a police state. If we acquiesce in this, there is no telling what personal liberties are next to be sacrificed. Courts must stand as the bulwark against the constant pressure to erode our constitutional rights.
The unconstitutional portions of R.C. Chapter 2950 are so connected with the general scope of the whole statute that striking them would fundamentally disrupt the statutory scheme. See Geiger v. Geiger (1927), 117 Ohio St. 451, 466, followed inState ex rel. Maurer (1994), 71 Ohio St.3d 513, 523-524. Therefore, R.C. Chapter 2950 as applied to sexual "predators" is void in its entirety.
For all of the foregoing, the trial court's judgment dismissing the sexual predator proceedings is hereby affirmed on alternative grounds. ______________________________ JUDGE ROBERT A. NADER
FORD, P.J., dissents with dissenting opinion,
O'NEILL, J., concurs.
[1] "Pursuant to its police powers, the General Assembly has the authority to enact laws defining criminal conduct and to prescribe its punishment." Statev. Thompkins (1996), 75 Ohio St.3d 558, 560. See, also,State v. Meyer (1955), 163 Ohio St. 279, 287 (criminal laws are enacted pursuant to police powers because "[t]he object of a criminal penalty is to punish the accused, deter others from crime, and to protect the public."). Therefore, Section 1, Article I of the Ohio Constitution also operates as a limitation of the General Assembly's power to create and define criminal offenses. See Morgan v. Nolte (1881), 37 Ohio St. 23, paragraph one of the syllabus. Thus, the precedents in the civil police power cases are applicable in criminal police power cases.
[2] Compare the Sipe case to Holsman v. Thomas (1925),112 Ohio St. 397 (protecting the public from fraud when buying jewelry at auction is clearly within the scope of the police power).
[3] Compare the Mirick case to Downing v. Cook (1982),69 Ohio St.2d 149 (regulating dog ownership is clearly within the state's police power).
[4] Compare the Steube case with Allion v. Toledo
(1919), 99 Ohio St. 416 (upholding an ordinance requiring sale of bread by whole weights in situations where an innocent purchaser is not aware that the loaf may be of a lesser weight on the ground that protecting the public from fraud was a legitimate exercise of the police power).
[5] The market value of the farm at issue in Booth
was $17,000, whereas the value of the coal underneath the farm was in excess of $1,000,000. The ordinance prohibited the coal company from extracting the coal, thereby reducing the practical value of the land by 98.3%. Although the coal company was not deprived of all economic uses of the land, it was the sheer magnitude of the deprivation which made the ordinance unreasonable. Compare the Booth case to Gerijo, Inc. v.Fairfield (1994), 70 Ohio St.3d 223, where a pre-existing farm was zoned for light industrial uses. For that use, the value of the farm was $40,000 per acre. The farmer, however, wanted to sell his farm to developers, who would have paid $65,000 per acre to build an apartment complex. The supreme court held the city's zoning ordinance was not confiscatory. Id. at 228. The court also held it substantially advanced the city's interest in the health, safety, and welfare of the community. Id. Although the argument was only implicitly addressed, we can also say that the magnitude of the deprivation, only 38.5%, was not unreasonable.
[6] Note that the Benjamin v. Columbus test focuses not on the actual text of the law, but on its effects.
[7] The exact holding of Kintz was that a person may sue another who has given maliciously false and slanderous testimony before a grand jury. InTaplin-Rice-Clerkin Co. v. Hower (1931), 124 Ohio St. 123, the court changed its mind, and held that grand jury testimony is privileged. The latter court, however, did not retract the statements in Kintz
regarding the nature of the right to protect one's reputation.
[8] See Holmes, The Path of the Law (1897), 10 Harv.L.Rev. 457, 470.
[9] H.B. No. 180 was passed in the House by a vote of 94 to three. House Journal, Wednesday, May 24, 1995. All 33 Senators voted in favor of Megan's Law. Senate Journal, Wednesday, May 29, 1996. Although one member of the standing Judiciary Committee voted against recommending its passage, he voted with the majority on the floor. The House voted 98 to one to concur in the Senate's changes. House Journal, Thursday, May 30, 1996.
 DISSENTING OPINION